Filed 1/23/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| ASSOCIATION OF CALIFORNIA INSURANCE COMPANIES et al., | ) ) ) | |
| Plaintiffs and Respondents, | ) ) ) | S226529 |
| v. | ) ) | Ct.App. 2/1 B248622 |
| DAVE JONES, as Commissioner, etc., | ) ) | Los Angeles County |
| Defendant and Appellant. | ) ) | Super. Ct. No. BC463124 |
| _____ | ) | |

The Legislature directed the Insurance Commissioner to "promulgate reasonable rules and regulations . . . as are necessary to administer" the Unfair Insurance Practices Act. (Ins. Code, § 790.10.) The question before us is whether that statutory authority supports the Insurance Commissioner's 2011 regulation covering replacement cost estimates for homeowners insurance (Cal. Code Regs., tit. 10, § 2695.183). We conclude that it does. Accordingly, we reverse the Court of Appeal's judgment invalidating the regulation.

## I. BACKGROUND

Wildfires are a fact of life in California, and so, too, are the threats they pose to people and property. After the 1991 Oakland Hills fire and 2003 Southern California wildfires, legislators discovered through public hearings an additional aspect of the danger wildfires pose to homeowners: underinsurance. In case after case, California residents whose homes had been damaged or destroyed explained

1

why they had believed their homeowners insurance would enable them to rebuild their dwellings. Once they presented their claim to their insurance company, though, these homeowners discovered that their coverage fell well short of what they needed — sometimes by hundreds of thousands of dollars — to rebuild their homes. (Sen. Rules Com., 3d reading analysis of Sen. Bill No. 2 (2005-2006 Reg. Sess.) as amended Aug. 30, 2005, pp. 3-4; Sen. Banking, Finance and Ins. Com., Analysis of Sen. Bill No. 2 (2005-2006 Reg. Sess.) as amended Mar. 29, 2005, pp. 3-6 (Sen. Analysis of Sen. Bill 2); Assem. Com. on Ins., Analysis of Sen Bill No. 1854 (1991-1992 Reg. Sess.) as amended Aug. 11, 1992, pp. 2-3.)

Between 1992 and 2005, the Legislature took several steps to address the divergence between homeowners' expectations of insurance coverage and the actual scope of coverage. (Stats. 2005, ch. 447, § 2, p. 3608; Stats. 2004, ch. 385, § 1, p. 3510; Stats. 2004, ch. 311, § 1, p. 3246; Stats. 1992, ch. 1089, § 1, p. 5031.) Nonetheless, when large wildfires struck Southern California in 2007 and 2008, state officials realized the underinsurance problem persisted. (Dept. of Ins., Market Conduct Div. Summary of Targeted Market Conduct Examination Findings — 2007 Wildfires (2010) p. 1; United Policyholders, 2007 Wildfires Insurance Claim Status Survey (2008) pp. 1-8.) The Insurance Commissioner (Commissioner) once again received numerous complaints from affected homeowners who realized only too late that they were substantially underinsured. In 2008, the Department of Insurance's market conduct division conducted an investigation of the four largest insurers — ones that together accounted for approximately half the market covering these losses. The survey revealed that for a majority of the policies examined, coverage limits matched what was indicated by the insurer's own coverage calculator. But the recommended coverage nonetheless understated what was actually needed to rebuild the insured's home over 80 percent of the time. Even when the homeowner had purchased extended

2

replacement cost coverage, 57 percent of these policies still underinsured their policyholders relative to the cost of rebuilding their homes.  A United Policyholders survey of victims who lost their homes in the 2007 wildfires similarly showed that only 26 percent had sufficient coverage to repair, replace, or rebuild their homes.  These victims were underinsured by an average of $240,000.  Once again, in a significant number of cases, the policyholder had relied on the estimate provided by the insurer's replacement cost estimate tool in purchasing such coverage.

Guaranteed replacement coverage was the norm as recently as the 1990s (Sen. Analysis of Sen. Bill 2, *supra*, at p. 6), but only a limited number of homeowners now qualify for such a product — and only a small subset of insurers even offers it.  The Commissioner therefore assigned considerable importance to the problem of underinsurance and sought to improve the accuracy of replacement cost estimates.  Although estimates for labor, building supply costs, and other costs of rebuilding a home may or may not turn out to be accurate, the Commissioner found that even the most careful estimate would be deficient and misleading if the estimate failed to consider the complete range of tasks necessary to repair or rebuild the home, such as the costs of replacing the foundation, debris removal and demolition expenses, and overhead and profit, as well as engineering reports and architectural plans.  The Commissioner also concluded that estimates would be more complete and accurate — and purchasers would be better informed about replacement cost coverage — if such estimates reflected the home's size, materials, square footage, wall heights, slope, and location; the type of frame, roof, and siding; the number of stories; and its age.

To address these concerns, the Commissioner proposed new regulations and amendments to existing regulations consistent with the procedures specified in the Administrative Procedure Act (Gov. Code, § 11340 et seq.).  According to the

Commissioner's initial statement of reasons, the proposed regulation standardized the components of a replacement cost estimate "to create a more consistent, comprehensive and accurate replacement cost calculation" and clarified that estimates "not comporting with the applicable provision of the regulation will constitute making a statement with respect to the business of insurance which is misleading and which by the exercise of reasonable care should be known to be misleading, pursuant to Insurance Code section 790.03." (Dept. of Ins., Initial Statement of Reasons, Standards and Training for Estimating Replacement Value on Homeowners' Insurance (Apr. 2, 2010) pp. 1, 20.) The Commissioner's initial statement of reasons also described the specific purpose and need for the regulations, the alternatives considered by the Commissioner, and the prenotice discussions held at the Department of Insurance's office. (See Gov. Code, §§ 11346.2, subd. (b), 11346.3, 11346.45, subd. (a).) The Commissioner's notice of proposed action solicited public comment, announced the time and date for a public hearing, and analyzed the potential economic impact of the regulations. (Gov. Code, §§ 11346.3, 11346.4, 11346.5.)

In response to public comments submitted in writing and at the public hearing, the Commissioner modified the proposed regulations and issued a "final statement of reasons" on November 17, 2010. (Gov. Code, § 11346.9.) The Commissioner also identified the specific statutes authorizing adoption of the regulations and listed the statutory provisions "being implemented, interpreted, or made specific" by each section of the regulations. (Gov. Code, § 11346.2, subd. (a)(2).) On December 29, 2010, the Office of Administrative Law approved the regulations. The regulations became effective on June 27, 2011.

A.  The Replacement Cost Regulation

The replacement cost regulation under review here is codified at California Code of Regulations, title 10, section 2695.183 (the Regulation; further regulation references are to tit. 10 of this code).  The Regulation does not require an insurer to set or recommend a policy limit or to provide an estimate of the cost to rebuild or replace a home.  (Cal. Code Regs., § 2695.183, subd. (m).)  But if the insurer does choose to opine on replacement costs, the Regulation specifies how that estimate is to be calculated and communicated.  In particular, it bars the insurer from communicating a replacement cost estimate in connection with an application for or renewal of a homeowners' insurance policy "unless the requirements and standards set forth in subdivisions (a) through (e) below are met."  (Cal. Code Regs., § 2695.183.)

Subdivision (a) requires a replacement cost estimate to account for "the expenses that would reasonably be incurred to rebuild the insured structure(s) in its entirety," which must include "at least" the cost of labor, building materials, and supplies; overhead and profit; the cost of demolition and debris removal; and the cost of permits and architect's plans.  (Reg., § 2695.183, subd. (a)(1)-(4).)  The estimate must also consider "components and features of the insured structure," including 11 specific items relevant to a typical rebuild, such as the type of foundation and framing, the roofing and siding materials, the square footage and number of stories, and the structure's geographic location.  (*Id*., subd. (a)(5)(A)- (K).)

The estimate must be based on "the cost to rebuild or replace the structure taking into account the cost to reconstruct the single property being evaluated" — and not the cost to build multiple or tract dwellings.  (Cal. Code Regs., § 2695.183, subd. (b).)  The estimate shall exclude the resale value of the land or the amount of any outstanding loan balance, and shall not include a deduction for

5

physical depreciation.  (*Id.*, subds. (c), (d); see Ins. Code, § 2051.5, subd. (a) ["replacement cost . . . is the amount that it would cost the insured to repair, rebuild, or replace the thing lost or injured, without a deduction for physical depreciation, or the policy limit, whichever is less"].)  At least annually, the insurer must "take reasonable steps" to verify that estimate methods are updated to reflect changes in the costs of rebuilding, including changes in the costs of labor, building materials, and supplies, taking into account a structure's geographic location.  (Cal. Code Regs., § 2695.183, subd. (e).)[1]

---

[1]     The Regulation provides in pertinent part:  "No licensee shall communicate an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis, unless the requirements and standards set forth in subdivisions (a) through (e) below are met:
        "(a) The estimate of replacement cost shall include the expenses that would reasonably be incurred to rebuild the insured structure(s) in its entirety, including at least the following:
        "(1) Cost of labor, building materials and supplies;
        "(2) Overhead and profit;
        "(3) Cost of demolition and debris removal;
        "(4) Cost of permits and architect's plans; and
        "(5) Consideration of components and features of the insured structure, including at least the following:
        "(A) Type of foundation;
        "(B) Type of frame;
        "(C) Roofing materials and type of roof;
        "(D) Siding materials and type of siding;
        "(E) Whether the structure is located on a slope;
        "(F) The square footage of the living space;
        "(G) Geographic location of property;
        "(H) Number of stories and any nonstandard wall heights;
        "(I) Materials used in, and generic types of, interior features and finishes, such as, where applicable, the type of heating and air conditioning system, walls, flooring, ceiling, fireplaces, kitchen, and bath(s);
        "(J) Age of the structure or the year it was built; and
        "(K) Size and type of attached garage.

*(footnote continued on next page)*

6

*(footnote continued from previous page)*

"(b) The estimate of replacement cost shall be based on an estimate of the cost to rebuild or replace the structure taking into account the cost to reconstruct the single property being evaluated, as compared to the cost to build multiple, or tract, dwellings.

"(c) The estimate of replacement cost shall not be based upon the resale value of the land, or upon the amount or outstanding balance of any loan.

"(d) The estimate of replacement cost shall not include a deduction for physical depreciation.

"(e) The licensee shall no less frequently than annually take reasonable steps to verify that the sources and methods used to generate the estimate of replacement cost are kept current to reflect changes in the costs of reconstruction and rebuilding, including changes in labor, building materials, and supplies, based upon the geographic location of the insured structure. The estimate of replacement cost shall be created using such reasonably current sources and methods.

"(f) Except as provided in subdivision (k) of this Section 2695.183, the provisions of this article are binding upon licensees, notwithstanding the fact that information, data or statistical methods used or relied upon by a licensee to estimate replacement cost may be obtained through a third party source. Any and all information received by the Department pursuant to this article shall be accorded the degree of confidential treatment required by section 735.5 of the Insurance Code or Chapter 2 of Part 1 of Division 3 of Title 2 of the Government Code, commencing at section 11180.

"(g)(1) If a licensee communicates an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis, the licensee must provide a copy of the estimate of replacement cost to the applicant or insured at the time the estimate is communicated. However, in the event the estimate of replacement cost is communicated by a licensee to an applicant to whom the licensee determines an insurance policy shall not be issued, then the licensee is not required pursuant to the preceding sentence to provide a copy of the estimate of replacement cost. In the event the estimate of replacement cost is communicated by telephone to an insured, the copy of the estimate shall be mailed to the insured no later than three business days after the time of the telephone conversation. In the event the estimate of replacement cost is communicated by telephone to an applicant, the copy of the estimate shall be mailed to the applicant no later than three business days after the applicant agrees to purchase the coverage.

*(footnote continued on next page)*

*(footnote continued from previous page)*

"(2) An estimate of replacement cost provided in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis must itemize the projected cost for each element specified in paragraphs (a)(1) through (a)(4), and shall identify the assumptions made for each of the components and features listed in paragraph (a)(5), of this Section 2695.183.

"(h) If an estimate of replacement cost is updated or revised by, or on behalf of, the licensee and the revised estimate of replacement cost is communicated to the applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis, the licensee shall provide a copy of the revised or updated estimate of replacement cost to the applicant as provided in paragraph (g)(1) of this Section 2695.183, or to the insured simultaneously with the renewal offer, as the case may be. This subdivision (h) shall not apply when the update or revision to the estimate of replacement cost or the policy limit results solely from the application of an inflationary provision in a policy or an inflation factor. This subdivision (h) shall not obligate a licensee to recalculate an estimate of replacement cost on an annual basis.

"(i) Licensees shall maintain (1) a record of the information supplied by the applicant or insured that is used by the licensee to generate the estimate of replacement cost, and (2) a copy of any estimate of replacement cost supplied to the applicant or insured pursuant to paragraph (g)(1), or subdivision (h), of this Section 2695.183. If a policy is issued, these records and copies shall be maintained for the entire term of the insurance policy or the duration of coverage, whichever terminates later in time, and for five years thereafter. However, if the estimate of replacement cost is provided to an applicant to whom an insurance policy is never issued, the records and copies referred to in the first sentence of this subdivision (i) shall be maintained for the period of time the licensee ordinarily maintains applicant files in the normal course of business, provided that such period of time shall be at least sufficient to ensure that the licensee is able to comply with the provisions of this subdivision in the event the policy is issued to the applicant.

"(j) To communicate an estimate of replacement value not comporting with subdivisions (a) through (e) of this Section 2695.183 to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis constitutes making a statement with respect to the business of insurance which is misleading and which by the

*(footnote continued on next page)*

B. The Unfair Insurance Practices Act

In 1959, the Legislature enacted the Unfair Insurance Practices Act (UIPA) (Ins. Code, § 790 et seq.). Its purpose is to regulate trade practices in the business of insurance "by defining, or providing for the determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." (Ins. Code, § 790.)[2] Section 790.03 "define[s]" various unfair methods of competition and unfair or deceptive acts or practices, including (as pertinent here) "[m]aking or disseminating or causing to be made or disseminated before the public in this state, in . . . any . . . manner or means whatsoever, any statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of his or her insurance business, which is untrue, deceptive, or misleading, and which is known, or which

---

*(footnote continued from previous page)*

exercise of reasonable care should be known to be misleading, pursuant to Insurance Code section 790.03.

"(k) When an insurer identifies one or more specific sources or tools that a broker-agent must use to create an estimate of replacement cost,

"(1) the insurer shall prescribe complete written procedures to be followed by broker-agents when they use the sources or tools,

"(2) the insurer shall provide the broker-agent with the training and written training materials necessary to properly utilize the sources or tools according to the insurer's prescribed procedures, and

"(3) the insurer, and not the broker-agent, shall be responsible for any noncompliance with this Section 2695.183 that results from the failure of the estimate to satisfy the requirements of subdivisions (a) through (e), unless that noncompliance results from failure by the broker-agent to follow the insurer's prescribed written procedures when using the source or tool." (Cal. Code Regs., § 2695.183, subds. (a)-(j).)

[2]     All further undesignated statutory references are to the Insurance Code.

by the exercise of reasonable case should be known, to be untrue, deceptive, or misleading." (§ 790.03, subd. (b).)

Empowered by authority granted in the UIPA, the Commissioner may investigate those engaged in the business of insurance. Through such investigation, the Commissioner can determine whether insurance companies are or have been engaged "in any unfair method of competition or in any unfair or deceptive act or practice prohibited by Section 790.03 or determined pursuant to this article to be an unfair method of competition or an unfair or deceptive practice in the business of insurance." (§ 790.04.) The Commissioner may bring an administrative enforcement action against, recover damages from, and enjoin any person who is or has been engaged "in any unfair method of competition or any unfair or deceptive act or practice defined in Section 790.03." (§ 790.05; see § 790.035.)

A separate statutory provision applies where the Commissioner believes a method of competition, act, or business practice "not defined in Section 790.03" nonetheless "should be declared to be unfair or deceptive." (§ 790.06.) The Commissioner may issue an order to show cause and initiate an administrative proceeding to determine whether the challenged conduct is unfair or deceptive — and, if determined to be unfair or deceptive, serve a written report so declaring on the insurer. (*Id*., subd. (a).) When proceeding under this provision, the Commissioner lacks the administrative authority to assess monetary penalties against the insurer or enjoin the conduct, but must instead apply (through the Attorney General) to the superior court for an injunction. (*Id*., subds. (b), (d).)

Finally, the UIPA grants the Commissioner rulemaking power: "The commissioner shall, from time to time as conditions warrant, after notice and public hearing, promulgate reasonable rules and regulations, and amendments and additions thereto, as are necessary to administer this article." (§ 790.10.)

C. The Declaratory Relief Action

A few weeks before the Regulation was to become effective, plaintiffs Association of California Insurance Companies and the Personal Insurance Federation of California (collectively, the Association) filed a complaint for declaratory relief. The action challenged the validity of the Regulation on the ground (1) that the Regulation exceeded the Commissioner's authority by defining a new unfair or deceptive insurance practice; (2) that the Regulation improperly restricted the underwriting of insurance, which the Commissioner lacked authority to regulate; and (3) that the Regulation violated insurers' rights to free speech under the state and federal Constitutions. The parties agreed that the case could be tried based on the rulemaking file, written briefs, and oral argument, without the need for oral testimony.

The trial court invalidated the Regulation on the first ground — i.e., "that the Commissioner exceeded his authority by attempting to define additional acts or practices by regulation rather than by the procedure set out in section 790.06." The trial court reasoned that an estimate of replacement costs is "inherently inaccurate" but could not be deemed misleading, unless one were to claim or imply that the estimate *was* accurate. Because the Regulation thus expanded the scope of misleading statements beyond that defined in section 790.03, subdivision (b), upholding the Regulation would "obviate the need" to use the mechanism in section 790.06 to determine that conduct not defined by the UIPA was unfair or deceptive. Having invalidated the Regulation, the trial court found it unnecessary to consider the Association's remaining challenges.

The Court of Appeal affirmed. The appellate court found it significant that the Legislature had specifically defined the advertising of insurance that the insurer does not sell as "an unfair and deceptive act or practice" (§ 790.036, subd. (a)) but had failed to so define incomplete replacement cost estimates. Invoking

11

the interpretive canon *expressio unius est exclusio alterius*, the court inferred that the omission "was a deliberate choice" by the Legislature and that "the Commissioner did not have authority to add content and format requirements for replacement cost estimates in homeowner insurance to the list of practices set forth in section 790.03 under the guise of deeming nonconforming estimates misleading under section 790.03, subdivision (b)."

The Court of Appeal believed also that the Commissioner's interpretation of his rulemaking authority would render it needlessly duplicative of his power to bring an enforcement action under section 790.05, on the one hand, or to institute an administrative proceeding under section 790.06 to determine whether undefined conduct was unfair or deceptive, on the other. As to the first, "there would be no need for the Regulation because, as the Commissioner points out, he would already have had the means in section 790.05 to assess penalties and issue a cease and desist order against a licensee the Commissioner believed had given a lowball or incomplete estimate . . . ." As to the second, the Commissioner "would never have to resort to the procedures in section 790.06 regarding practices not 'defined' in section 790.03 because the Commissioner could always argue that conduct not meeting standards in a regulation promulgated under the cover of the Commissioner's power to administer under section 790.10 would be 'misleading.' "

We granted review to consider the Commissioner's authority to promulgate regulations implementing, interpreting, or making specific the prohibitions in section 790.03, subdivision (b).

## II. DISCUSSION

The Regulation, like any agency action, comes to the court with a presumption of validity. (*Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16 Cal.3d 651, 657; Gov. Code, § 11343.6.) The Association contends the Regulation falls

12

outside the lawmaking authority delegated by the Legislature to the Insurance Commissioner, and conflicts with the UIPA.  (Gov. Code, §§ 11342.1, 11342.2.) These contentions implicate interpretation of the relevant statutes, which is a question of law on which this court exercises independent judgment.  (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415 (*Western States*).)  In exercising our ultimate responsibility to construe the statutory scheme, however, we " ' "accord[] great weight and respect" ' " to the administrative agency's construction.  (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 461 (*American Coatings*); see also *Western States*, at p. 415.)

How *much* weight to accord the agency's construction depends on the context, a term encompassing both the nature of the statutory issue and characteristics of the agency.  (*American Coatings*, *supra*, 54 Cal.4th at p. 461.) Among the factors bearing on the value of the administrative interpretation, two broad categories emerge:  factors relating to the agency's technical knowledge and expertise, which tend to suggest the agency has a comparative interpretive advantage over a court; and factors relating to the care with which the interpretation was promulgated, which tend to suggest the agency's interpretation is likely to be correct.  (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha*).)  Bearing these factors in mind, we retain the ultimate responsibility to decide whether the Regulation falls within the Commissioner's " 'broad discretion to adopt rules and regulations as necessary to promote the public welfare.' " (*State Farm Mut. Auto Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1040.)

13

A. Whether the Regulation Exceeded the Authority Granted to the Commissioner by the Legislature

The Commissioner leads an executive agency created by statute. He or she has only as much rulemaking power as that statute invests in the Commissioner. (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299.) Regulations that alter or amend the statute, or enlarge or impair its scope, are invalid. (*Id.* at p. 300.) A valid regulation must fit "within the scope of authority conferred" by the Legislature. (Gov. Code, § 11342.1.)

What authority the Legislature conferred here appears to be quite broad: "The Commissioner shall, from time to time as conditions warrant, after notice and public hearing, promulgate reasonable rules and regulations, and amendments and additions thereto, as are necessary to administer this article." (§ 790.10.) The "article" referenced in section 790.10 is article 6.5 (unfair practices; Ins. Code, div. 1, pt. 2, ch. 1, art 6.5, § 790 et seq.), which includes the prohibition in section 790.03, subdivision (b) on making or disseminating *any* untrue, deceptive, or misleading statements with respect to the business of insurance. Implied in the phrase "from time to time as conditions warrant" is a measure of flexibility for the Commissioner to discern when regulation is proper. The Commissioner thus ostensibly has authority to craft regulations as necessary to administer the statutory bar on untrue, deceptive, or misleading statements. (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1269 [declaring that § 790.10 granted the Commissioner power to "flesh out the statutory public policy" of the UIPA].)

We construed a very similar grant of regulatory authority in *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347 (*Ford Dealers*). The Legislature had endowed the director of the Department of Motor Vehicles (DMV) with the power to adopt and enforce rules and regulations " 'as may be

14

necessary to carry out the provisions' of the Vehicle Code" (*Ford Dealers*, at p. 354, quoting Veh. Code, § 1651), and we considered the validity of various regulations designed to implement a statutory bar on making or disseminating untrue or misleading statements. (*Id*. at p. 356.) One of the challenged regulations concerned dealer-added charges for services performed by the dealer that are or will be reimbursed by the franchisor. The trial court had found the regulation invalid "as beyond the scope of the authorizing statute." (*Id*. at p. 362.) In reversing, we explained that the DMV, which was authorized "to ' "fill up the details" ' of the statutory scheme," had the statutory authority to promulgate a regulation "barring a specific class of misleading statements." (*Id*. at pp. 362-363.)

The grant of regulatory authority to the Commissioner in section 790.10 is written in terms of what is necessary to *administer* the authorizing statute (see also §§ 765, 10199.5, 10234, 10509.918, 10608, 10820, 12129, 12880.5), not what is necessary to carry it out (as in *Ford Dealers*, *supra*, 32 Cal.3d 347) or implement it. We do not perceive such slight difference in wording to evince any substantial distinction in the power the Legislature conveyed. (*Morris v. Williams* (1967) 67 Cal.2d 733, 741 & fn. 10 [explaining that a statute granting the Health and Welfare Agency the power to " 'adopt such rules and regulations as are necessary for carrying out . . . the provisions' " of the law "authorized the Administrator of the . . . Agency to administer the program"]; see Webster's Collegiate Thesaurus (1976) p. 16 ["administer" is synonymous with "carry out effectively"]; Burton's Legal Thesaurus (4th ed. 2007) p. 16 ["administer" is synonymous with "carry out," "control," and "direct"].) To administer is to carry out or direct, and in the process to implement.

Consider another example. In *Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999 (*Moore*), we upheld a regulation by the State

15

Board of Accountancy specifying that particular titles and designations were misleading. The board had been granted power "to adopt regulations as may be reasonably necessary to administer the Accountancy Act" (*id.* at p. 1010), which included a general prohibition on the use of any title or designation that was likely to be confused with the terms reserved for licensed accountants. (*Id.* at p. 1004.) In construing the board's authority to administer the general prohibition on misleading titles and designations, we found it "apparent" that the board had been delegated the power to determine whether a particular title or designation not explicitly identified in the statute was nonetheless likely to confuse or mislead the public. (*Id.* at p. 1013.) We note as well that other jurisdictions have characterized a similar grant of administrative rulemaking authority as "broad." (*Suttman v. Brown* (1993) 5 Vet.App. 127, 135; *Massachusetts Elec. Co. v. Department of Pub. Utils.* (Mass. 1994) 643 N.E.2d 1029, 1033; *Pascucci v. Vagott* (N.J. 1976) 362 A.2d 566, 571.)

The Commissioner's authority to administer the UIPA thus includes the power to promulgate a rule applying to a specific kind of statement prohibited under section 790.03, subdivision (b). This definition of "administer" is consistent with the scope of the word as used in the statutory definition of "regulation," which provides that an agency's authority to enforce or administer a statute includes the power to adopt a regulation "to implement, interpret, or make specific the law enforced or administered by it." (Gov. Code, § 11342.600.)

Relying on a series of arguments based on the structure of the UIPA, the Association contends that the grant of regulatory authority here should be construed more narrowly than in *Ford Dealers* and *Moore*. The Association points out that the UIPA either defines or provides for the determination of unfair or deceptive acts or practices. (§ 790 ["The purpose of this article is to regulate trade practices in the business of insurance . . . by defining, or providing for the

16

determination of, all such practices . . . which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined"].)  From this, the Association reasons that the Legislature reserved to *itself* the power to define unfair or deceptive acts (as, for example, in § 790.03) and to set forth a procedure by which conduct not statutorily defined as unfair or deceptive could be determined (using the order to show cause procedure in § 790.06) to be so.  In the Association's view, the Regulation is either unnecessary (in that the subject of the Regulation has already been defined as unfair in § 790.03), or it represents an unlawful expansion of the Commissioner's power by purporting to reach conduct not otherwise defined as unfair or deceptive without complying with the order to show cause procedure in section 790.06.

The dichotomy posited by the Association is incomplete.  Yes, the Legislature "defined" untrue, deceptive, or misleading statements with respect to the business of insurance as an unfair method of competition or an unfair and deceptive act or practice in section 790.03, subdivision (b).  But it would be wrong to conclude that the Commissioner was thereby deprived of authority to "interpret, or make specific" those defined methods, acts, or practices by rule or regulation. (Gov. Code, § 11342.600.)  Where, as here, the Legislature uses open-ended language that implicates policy choices of the sort the agency is empowered to make, a court may find the Legislature delegated the task of interpreting or elaborating on the statutory text to the administrative agency.  (*American Coatings*, *supra*, 54 Cal.4th at p. 461.)

In this instance, the Commissioner undertook an investigation into the widespread problem of underinsurance and, in particular, the disconnect between a homeowner's expectation and the actual scope of insurance coverage purchased. Based on that investigation, he determined that an incomplete replacement cost estimate — i.e., an estimate that fails to account for *all* of the costs necessary to

17

rebuild the structure — qualifies as "a specific kind of misleading statement," and that regulation of *any* misleading statement "is authorized by the broad statutory prohibition against false and misleading statements" in section 790.03, subdivision (b).  (*Ford Dealers*, *supra*, 32 Cal.3d at p. 362.)  The Commissioner's determination complied with relevant procedures in the Insurance Code and the Administrative Procedure Act, which require an initial statement of reasons from the agency, a request for public comment, a public hearing, an assessment of alternatives to and the economic impact of the Regulation, and a final statement of reasons and written responses to public input.  Even if the statutory prohibition on misleading statements is (as the Association contends) self-executing, an administrative agency nonetheless has authority to promulgate rules and regulations as reasonably necessary to administer it.  (*American Nurses Assn. v. Torlakson* (2013) 57 Cal.4th 570, 586; *Armstrong v. County of San Mateo* (1983) 146 Cal.App.3d 597, 610.)

A survey of the agency's legal authority and role readily shows why.  As the Association concedes, the Commissioner could certainly have brought an enforcement action against an insurer's use of misleading replacement cost estimates under section 790.05, which permits an agency to address unfair practices defined in section 790.03 on a case-by-case basis even in the absence of a specific regulatory rule.  What this enforcement power does not imply is that the Commissioner was disabled from addressing the problem posed by such estimates through regulation.  A key part of the expertise an agency brings to bear on its administrative function is its assessment of the tradeoffs inherent in deciding whether to enforce a statutory mandate by way of an adjudication against a regulated entity or through a generalized rule.  (Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy* (1965) 78 Harv. L.Rev. 921; see generally *California Building Industry Assn. v. Bay Area*

18

*Air Quality Management Dist.* (2015) 62 Cal.4th 369, 390; *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 824.) Adjudication may prove desirable when a problem is unforeseeable, when it is so specialized or idiosyncratic as not to be susceptible to a general rule, or when the agency lacks the experience to justify announcement of a general rule. (*Agricultural Labor Relations Bd. v. California Coastal Farms, Inc.* (1982) 31 Cal.3d 469, 478-479; accord, *Securities & Exch. Com. v. Chenery Corp.* (1947) 332 U.S. 194, 202-203.) Rulemaking, on the other hand, offers the agency an opportunity to research and develop all relevant arguments from the affected stakeholders and address a problem in a comprehensive way that treats regulated entities in a like manner. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568-569, 576; accord, *National Petroleum Refiners Assn. v. FTC* (D.C. Cir. 1973) 482 F.2d 672, 682-683.)

Where an agency has been granted both the power to adjudicate and to promulgate rules, we generally defer to the agency's choice of how to proceed. In *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, for example, we upheld the agency's authority to issue a regulation allowing qualified access to agricultural property by farm labor organizers, even though the agency could have filed a complaint and obtained injunctive relief against an employer's interference with the farmworkers' right to organize and bargain collectively. (*Id.* at pp. 399-400, 413.) Relying on a "well-settled principle of administrative law," we declared that "in the absence of an express statutory directive to the contrary . . . the choice between proceeding by general rule or by ad hoc adjudication 'lies primarily in the informed discretion of the administrative agency.' " (*Id.* at p. 413, quoting *Securities & Exch. Com. v. Chenery Corp.*, *supra*, 332 U.S. at p. 203.) An agency's choice regarding the use of rulemaking or adjudication implicates the expertise and accountability rationales that cut in favor of deference to the agency,

19

and the Association does not contend that any statute expressly limited the Commissioner's ability to choose between rulemaking and adjudication. We therefore defer to the Commissioner's decision to address the problem of underinsurance by rulemaking.

Finding otherwise would not only cut against the grain of our previous decisions and the importance they ascribe to the agency's expertise in deciding how it makes policy, but would also eviscerate section 790.10. It is the agency's prerogative to promulgate reasonable rules and regulations "as are necessary to administer" the Unfair Insurance Practices Act (§ 790.10) — not merely to do so where it cannot otherwise address offending conduct through enforcement actions.

It follows that the Commissioner's authority under section 790.06 to determine what *undefined* conduct qualifies as unfair or deceptive is irrelevant to the question whether the Commissioner had the authority to regulate incomplete replacement cost estimates as misleading statements within the meaning of section 790.03, subdivision (b). The Regulation does not address an unfair method, act, or practice "that is not defined in Section 790.03." (§ 790.06, subd. (a).) To the contrary: the Legislature has already "defined" untrue, deceptive, or misleading statements with respect to the business of insurance as unfair methods, acts, or practices in section 790.03, subdivision (b). Indeed, the Association's insistence that misleading replacement cost estimates could be adjudicated under section 790.05, which is limited to unfair acts and practices "defined in Section 790.03," effectively concedes as much. The Commissioner's rulemaking authority to delineate particular categories of misleading statements is unaffected by his power under section 790.06 to identify *new* categories of unfair acts or practices, including acts or practices that are unfair but that do not involve the use of misleading statements, such as redlining.

Finally, we reject the Association's assertion that the Commissioner's regulatory authority must be narrowly cabined to fit what the Association takes to have been the Legislature's intended purpose in enacting section 790.10. (Stats. 1971, ch. 975, § 1, p. 1887.) The Association relies on a snippet of an enrolled bill report prepared by the Department of Finance — an entity that has no role in administering or enforcing the UIPA — that estimated the fiscal effect of section 790.10 as "[o]ne time $1,500 hearing costs." (Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 1353 (1971 Reg. Sess.) Oct. 8, 1971, p. 1.) From the "low figure" and the reference to " 'one time' costs," the Association infers that "all the Legislature anticipated was limited post-enactment activity" and "did not expect that the Commissioner would engage in quasi-legislative lawmaking of the sort represented by the . . . Regulation." Whether or not the enrolled bill report language suggests the Department of Finance assumed that only a single hearing would occur during the period for which expenses were estimated, we are unpersuaded. Although we have often found enrolled bill reports instructive on matters of legislative intent when prepared by a responsible agency contemporaneously with passage, we have also cautioned that such a report "cannot be used to alter the substance of legislation." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, fn. 3.)

If read in the way the Association suggests, the enrolled bill report would be flatly inconsistent with the statutory text. There is nothing remotely resembling a "one time" limitation in section 790.10. Rather, the Legislature provided the Commissioner with authority to promulgate rules and regulations "from *time to time as conditions warrant*," as well as "amendments and additions thereto." (§ 790.10, italics added.) Whatever else "from time to time" means, it cannot conceivably mean the opposite of "from time to time": that the agency's

21

regulatory authority under section 790.10 is a single-admission ticket that can be punched only once.

Moreover, an enrolled bill report cannot prevail over "more direct windows into legislative intent," such as a committee analysis of the bill.  (*Conservatorship of Whitley*, *supra*, 50 Cal.4th at p. 1218, fn. 3.)  Those sources likewise undermine the Association's reading.  One legislative bill summary recited that the proposal to enact section 790.10 "gives the Insurance Commissioner the authority to promulgate rules and regulations so that if the need therefor arises, he can, without delay, promulgate necessary rules making such practices definite and specific for the benefit of the public without having to wait for the Legislature to act at a later date."  (Assem. Com. on Finance and Ins., summary of Assem. Bill No. 1353 (1971 Reg. Sess.) p. 1 [undated; contained in committee bill file]; see also Legis. Counsel, letter to Sen. Clark L. Bradley, July 14, 1971, p. 2 [the bill authorizes the Commissioner to promulgate rules and regulations "as conditions warrant"]; see generally *Tidewater Marine Western, Inc. v. Bradshaw*, *supra*, 14 Cal.4th at p. 576 ["agencies cannot always respond to changing circumstances promptly if they must ask the Legislature for a statutory amendment"].)  As the Legislative Counsel pointed out, the only limitation on the Commissioner's regulatory authority under section 790.10 was the general requirement that the regulations "be consistent, and not in conflict, with" the UIPA and be "reasonably necessary to effectuate the purposes" of that legislation.  (Legis. Counsel, letter to Sen. Clark L. Bradley, *supra*, at p. 3.)

In any event, the nominal sum set forth in the enrolled bill report is fully consistent with the Commissioner's determination that the Regulation "will result in no cost or savings to any state agency."  In light of the statutory text and other indicia of section 790.10's purpose, however, the enrolled bill report does not

22

appear to shed light on the number, scope, or timing of regulations that could be promulgated by the Commissioner.

B. Whether the Regulation Is Consistent With the UIPA

Having concluded that the Regulation fits within the lawmaking authority delegated by the Legislature, we now consider whether the Regulation is "consistent and not in conflict with" the statute and whether it is "reasonably necessary to effectuate the purpose of the statute." (Gov. Code, § 11342.2.) The parties contend that our analysis of those questions depends in part on whether the Regulation is best understood as quasi-legislative or interpretive.

Quasi-legislative rules represent "an authentic form of substantive lawmaking" in which the Legislature has delegated to the agency a portion of its lawmaking power. (*Yamaha*, *supra*, 19 Cal.4th at p. 10; see *Western States*, *supra*, 57 Cal.4th at pp. 414-415.) Because such rules "have the dignity of statutes," a court's review of their validity is narrow: "If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Yamaha*, at pp. 10-11.)

Not so with an interpretive rule that is devoid of any quasi-legislative authority. Such a rule instead represents the agency's understanding of the statute's meaning and effect — consequential, but not an exercise of delegated lawmaking power. (*Yamaha*, *supra*, 19 Cal.4th at p. 11.) A court reviewing the validity of an interpretive rule therefore must consider more than simply whether the rule is within the scope of the authority conferred, and whether the rule is reasonably necessary to effectuate the statute's purpose. Rather, a court must also consider whether the administrative interpretation is a proper construction of the statute. (Gov. Code, §§ 11342.1, 11342.2.) In answering the latter question, the

standard of review " 'is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction.' " (*Yamaha*, at p. 12.) While the agency's position therefore matters a great deal, its interpretation does not carry with it the dignity of statutes.

Although the characterization of the Regulation as quasi-legislative or interpretive directs the sequence of a reviewing court's analysis, some rules defy easy categorization. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 799 (*Ramirez*).) It may be helpful instead to imagine "quasi-legislative" and "interpretive" as the outer boundaries of a continuum measuring the breadth of the authority delegated by the Legislature. (*Ibid*.) Thus, in certain circumstances, a regulation may have both quasi-legislative and interpretive characteristics — "as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms." (*Ibid*.)

In this instance, we need not decide whether the Regulation's interpretation of a "misleading" statement under section 790.03, subdivision (b) is best characterized as quasi-legislative or merely an interpretive rule devoid of any quasi-legislative authority. (*Ramirez*, *supra*, 20 Cal.4th at pp. 800-801.) Even if the Regulation were considered purely interpretive, we would conclude that the Commissioner has reasonably and properly interpreted the statutory mandate.

It is the Commissioner who is charged with implementing the UIPA. In doing so here, the Commissioner set forth his interpretation in a regulation adopted pursuant to the Administrative Procedure Act. (*Ramirez*, *supra*, 20 Cal.4th at p. 801.) Moreover, the Regulation does no more than identify a specific class of offending statements within the general statutory prohibition on *any* untrue, deceptive, or misleading statements in connection with the business of insurance. (*Ford Dealers*, *supra*, 32 Cal.3d at p. 362-363; *Association of*

24

*California Ins. Cos. v. Poizner* (2009) 180 Cal.App.4th 1029, 1047-1048.)  In the Commissioner's view, "calling something a replacement cost estimate when what is being estimated is necessarily something less than what it could take to replace the structure is a misleading statement."

The Association points to the list of unfair acts or practices prohibited by the other subdivisions of section 790.03, including a detailed enumeration of 16 separate unfair claims settlement practices set forth in subdivision (h).  Invoking the maxim *expressio unius est exclusio alterius*, the Association contends that the Legislature's decision not to specifically designate incomplete replacement cost estimates as misleading statements must be viewed as a conscious choice by the Legislature.  The Commissioner, in its view, was therefore precluded from promulgating a regulation on the topic of replacement cost estimates.  The Association has misconstrued the maxim as well as the interplay between the Commissioner and the Legislature.  When the *expressio unius* canon of construction is applicable, it implies that "the explicit mention of some things in a text may imply other matters not similarly addressed are excluded."  (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514.)  But the fact that the Legislature defined as unfair or deceptive a detailed list of specific unfair claims settlement practices in section 790.03, subdivision (h) — or (as the Court of Appeal pointed out) defined as unfair or deceptive the act of advertising insurance the insurer does not sell (§ 790.036, subd. (a)) — does not signal an intent to exempt any particular category of misleading statements from the broad prohibition on such statements in section 790.03, subdivision (b).  (*Ibid.*)  Rather, it means only that the Legislature did not itself choose to specify the types of statements that *must* be deemed misleading and entrusted that determination instead to the Commissioner's expertise.  (*Ford Dealers*, *supra*, 32 Cal.3d at pp. 362-363; *Credit Ins. Gen. Agents Assn. v. Payne*, *supra*, 16 Cal.3d at p. 656.)  That

25

the Legislature entrusted to the Commissioner the application of these and other statutory provisions to specific problems — problems the Legislature did not, and in some cases could not, anticipate — is precisely why enactment of section 790.10 makes sense in the broader statutory scheme.

To conclude that these statutory schemes require the Legislature to define in advance every problem it expects an agency to address is to suggest that the Legislature had little need for agencies in the first place. We rejected an analogous argument in *Ralphs Grocery Co. v. Reimel* (1968) 69 Cal.2d 172, which upheld a Department of Alcoholic Beverage Control regulation addressing quantity discounts for beer. The Department asserted it had broad authority to address the issue under Business and Professions Code section 25006, which granted power to " 'adopt such rules . . . as will foster and encourage the orderly wholesale marketing and wholesale distribution of beer.' " (*Ralphs Grocery*, *supra*, 69 Cal.2d at p. 174.) The challengers sought to invalidate the regulation by pointing out that the Legislature had separately enacted laws governing quantity discounts on milk and wine and drawing the inference that the Legislature had therefore consciously chosen not to regulate quantity discounts for beer. (*Id*. at p. 182.) In rejecting the proposed inference, we declared that the challengers had misapprehended the relationship between specific statutory mandates and general grants of power to an administrative agency. (*Ibid*.) When the Legislature is confident that it has identified a given problem and the best solution, it may enact its specific remedy into statutory law — as it did with unfair claims settlement practices in section 790.03, subdivision (h). But the Legislature may also choose to grant an administrative agency broad authority to apply its expertise in determining whether and how to address a problem without identifying specific examples of the problem or articulating possible solutions. (*Ralphs Grocery*, at pp. 182-183.)

26

We similarly reject the suggestion by amicus curiae Pacific Association of Domestic Insurance Companies that the disclosure form mandated by section 10102 impliedly restricted the Commissioner's authority to specify the content of a replacement cost estimate. The form, which must be provided prior to or concurrent with an application for or renewal of residential property insurance (§ 10102, subds. (a), (d)), warns the applicant of the risks of underinsurance, advises that "[t]he coverage limit on the dwelling structure should be high enough so you can rebuild your home if it is <u>completely</u> destroyed," and directs the insured to contact the agent, broker, or insurance company "if you believe your policy limits may be inadequate." (Stats. 2010, ch. 589, § 2 [residential dwellings coverage form].) Far from being inconsistent or in conflict with the disclosure form, the Regulation works in a complementary fashion with it. Once the disclosure form leads the applicant to inquire further about coverage limits, the Regulation helps ensure that any replacement cost estimate supplied by the insurer is high enough that the coverage secured will allow the property owner to rebuild the dwelling even if it is completely destroyed.

The trial court reasoned that a replacement cost estimate — as an *estimate* — is inherently inaccurate and therefore cannot be deemed "misleading" within the meaning of section 790.03, subdivision (b). But the defect sought to be remedied by the Regulation is not the possibility that actual costs, for unforeseeable reasons, may not align with estimated costs. Rather, the Regulation seeks to reduce the possibility that an estimate would be misleading by ensuring that the estimate include all that is reasonably knowable about actual costs at the time the insurance contract is executed. It may be theoretically possible for a replacement cost estimate that omits consideration of labor costs or the materials used in constructing the home nonetheless to come close to the actual replacement cost if (say) the expected rate of inflation or some other cost component was badly

27

or unreasonably overstated. But the estimate would still have been misleading in purporting to represent *each* of the essential components for rebuilding the dwelling. In addition, it would have been misleading to the extent that the incomplete estimate could not meaningfully have been compared with a competitor's estimate that *did* faithfully account for each component necessary to rebuild the dwelling. In any event, the validity of the Regulation does not depend on a finding that an incomplete replacement cost estimate would be misleading in every conceivable circumstance. The prohibition on untrue or misleading statements in section 790.03, subdivision (b), like the statutory prohibition on untrue or misleading statements at issue in *Ford Dealers*, extends to statements that are " 'likely' " to deceive the public. (*Ford Dealers*, *supra*, 32 Cal.3d at p. 363.) The Commissioner could reasonably conclude that replacement cost estimates are likely to mislead the public about the actual cost of repair or replacement when they willfully omit cost components essential to repairing or rebuilding a dwelling. (Cf. *Argonaut Ins. Co. v. Industrial Acc. Com.* (1962) 57 Cal.2d 589, 595 [an estimate of lost earnings that omits "relevant and helpful" facts "may be misleading"].)

The individual components the Regulation requires were also subject to a brief challenge from the Association. The Association asserts, for example, that a dwelling's age (Cal. Code Regs., § 2695.183, subd. (a)(5)(J)) may have no bearing on the cost to replace the structure, and that the annual requirement to verify and update sources and methods of estimating replacement costs (*id*., subd. (e)) may be unnecessary if costs have not changed or have decreased in the interim. As the Commissioner pointed out in his initial statement of reasons, however, a structure's age may help identify the costs of complying with current building code requirements and assess the availability of certain materials. And the happenstance that a replacement cost estimate might in unusual circumstances

28

remain current even without taking reasonable steps to update the sources and methods of estimating replacement costs on an annual basis is hardly a basis for invalidating the Regulation. If (as the Association supposes) the estimate thereby provided "a dollar amount *higher* than required to cover reconstruction," the estimate would have resulted in the unnecessary expense of overinsurance and would, once again, be misleading.

Finally, we reject the Association's challenge to the parts of the Regulation detailing the format of the replacement cost estimate, the means by which such estimates are to be communicated to the applicant or insured, and how records shall be maintained. (Cal. Code Regs., § 2695.183, subds. (g)-(i).) The Regulation deems misleading only those estimates that fail to comply with the content requirements of subdivisions (a) through (e). (*Id*., subd. (j).) Whether an estimate that fails to comply with the other parts of the Regulation is misleading would depend on the circumstances of the particular case. Because the Association has advanced only a facial challenge to the Regulation, its burden was to show, at the least, that a noncompliant estimate would not be misleading in the generality or vast majority of cases. (*Association of California Ins. Cos. v. Poizner*, *supra*, 180 Cal.App.4th at p. 1054; *T.H. v. San Diego Unified School Dist.* (2004) 122 Cal.App.4th 1267, 1281; see generally *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218.) The Association has not carried its burden. Moreover, the recordkeeping components of the Regulation appear designed to facilitate the Commissioner's ability to examine and investigate an insurer's compliance with the substantive components of the Regulation. (See Ins. Code, § 790.04.) We therefore reject the Association's facial challenge to the Regulation.

29

## III. CONCLUSION

The Commissioner enacted the replacement cost regulation by exercising valid authority conferred under section 790.10 of the UIPA. That the Commissioner also possesses authority to enforce the statute through case-by-case adjudication merely underscores that sometimes agencies must make considered judgments about how they will implement a statute. But such authority does not preclude the Commissioner's use of a regulation to address the type of concern that motivated the present measure. Neither the UIPA nor any other statute categorically limits the Commissioner's authority to issue the Regulation. On the contrary: section 790.10 explicitly vests in the Commissioner authority to issue "reasonable rules and regulations" to administer the UIPA. Which is what the Commissioner sought to do here.

Because the Regulation was invalidated below solely under the Administrative Procedure Act, neither the trial court nor the Court of Appeal has yet considered the Association's remaining challenges to the Regulation. We therefore reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with our opinion.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

30

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Association of California Insurance Companies v. Jones

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 235 Cal.App.4th 1009
**Rehearing Granted**

_____

**Opinion No.** S226529
**Date Filed:** January 23, 2017

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Gregory Wilson Alarcon

_____

**Counsel:**

Kamala D. Harris, Attorney General, Edward C. DuMont, State Solicitor General, Paul D. Gifford and Diane S. Shaw, Assistant Attorneys General, Janill L. Richards and Linda Berg Gándara, Deputy State Solicitors General, W. Dean Freeman, Stephen Lew and Lisa W. Chao, Deputy Attorneys General, for Defendant and Appellant.

Michael R. Asimow as Amicus Curiae on behalf of Defendant and Appellant.

Amy Bach, Daniel Wade; Kerr & Wagstaffe, Ivo Michael Labar and Daniel J. Veroff for United Policyholders, Scripps Ranch Civic Association and Rancho Bernardo Community Council as Amici Curiae on behalf of Defendant and Appellant.

Seth E. Mermin, Thomas Bennigson, Joseph Lavitt and Alexi Pfeffer-Gillett for Consumers for Auto Reliability and Safety, East Bay Community Law Center, Housing and Economic Rights Advocates, Public Counsel and Public Good Law Center as Amici Curiae on behalf of Defendant and Appellant.

Greenberg Traurig, Gene Livingston , Gregory Sperla, Stephen E. Paffrath; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Julian W. Poon, Vanessa C. Adriance and Jennafer M. Tryck for Plaintiffs and Respondents.

Hinshaw & Culbertson, Robert W. Hogeboom and Kent R. Keller for The Pacific Association of Domestic Insurance Companies as Amicus Curiae on behalf of Plaintiffs and Respondents.

Luke A. Wake; Benbrook Law Group, Bradley A. Benbrook and Stephen M. Duvernay for National Federation of Independent Business Small Business Legal Center, California Business Roundtable, and California Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Janill L. Richards
Deputy State Solicitor General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2481

Theodore J. Boutrous, Jr.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000