Filed 9/20/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| PACIFICARE LIFE AND HEALTH INSURANCE COMPANY, | |
| Plaintiff and Respondent, | G053914 |
| v. | (Super. Ct. No. 30-2014-00733375) |
| DAVE JONES, AS INSURANCE COMMISSIONER, etc., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Kim Garlin Dunning, Judge. Reversed. Appellant's request for judicial notice and supplemental request for judicial notice are granted. Respondent's request for judicial notice is granted in part and denied in part.

Xavier Becerra, Attorney General, Edward C. DuMont, State Solicitor General, Diane S. Shaw, Assistant Attorney General, Janill L. Richards and Christina

Bull Arndt, Deputy State Solicitors General, Lisa W. Chao and Laura E. Robbins, Deputy Attorneys General, for Defendant and Appellant.

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Kahn A. Scolnick; Dentons US, Steven A. Velkei and Felix Woo for Plaintiff and Respondent.

Greenberg Traurig, Gene Livingston and William Gausewitz for the American Council of Life Insurers, the Association of California Life and Health Insurance Companies, the Independent Insurance Agents & Brokers of California, the Personal Insurance Federation of California, and the Property Casualty Insurers Association of America as Amici Curiae on behalf of Plaintiff and Respondent.

\* \* \*

**INTRODUCTION**

Dave Jones, in his capacity as Insurance Commissioner of the State of California (the Commissioner), appeals from an order enjoining him from enforcing three regulations, adopted in 1992, to implement the unfair claims settlement practices provision of the Unfair Insurance Practices Act (UIPA) (Ins. Code, § 790, et seq.)[1] The injunction was issued at the conclusion of the first phase of a trial in which PacifiCare Life and Health Insurance Company is challenging the Commissioner's finding that it had committed over 900,000 acts and practices in violation of the Insurance Code.

The first of the three enjoined regulations states that, for purposes of the statute defining unfair claims settlement practices (§ 790.03, subd. (h) (790.03(h)), a violation occurs when the prohibited settlement practice is either "knowingly committed on a single occasion," or "performed with such frequency as to indicate a general business practice." (Cal. Code Regs., tit. 10, § 2695.1(a).)[2] The second regulation defines

---

[1]  All further statutory references are to the Insurance Code unless otherwise indicated.

[2]  All further regulatory references are to Title 10 of the California Code of Regulations and are identified as "Reg."

2

the word "'[k]nowingly'" to include implied and constructive knowledge (Reg. 2695.2(l)). The third regulation defines the word "'[w]illful'" without requiring any specific intent to cause harm or violate the law. (Reg. 2695.2(y).)

We reverse the order imposing the injunction in its entirety. The trial court determined the first regulation was inconsistent with the language of section 790.03(h), which it concluded had been interpreted by our Supreme Court in *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 303 (*Moradi-Shalal*), and in *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 379-380, fn. 8 (*Zhang*), to apply only to insurers engaged in a pattern of misconduct. We disagree. As we will discuss further below, our Supreme Court's only binding interpretation of that statutory language is found in *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d. 880, 891 (*Royal Globe*), which held that section 790.03(h) can be violated by an insurer's single knowing act. Consequently, we must apply that precedent.

After considering the Supreme Court's comments on the "single act liability" issue in *Moradi-Shalal* and *Zhang* in their proper contexts, we conclude that to the extent they suggest disagreement with the court's holding in *Royal Globe* on that specific issue, those comments are dicta. We also believe PacifiCare's contrary interpretation would be inconsistent with the unambiguous direction provided on this issue by the Legislature over the past 80 years.

The trial court also erred in declaring the Commissioner's regulations defining "'[k]nowingly committed'" and "'[w]illfull' or '[w]illfully'" to be invalid. The Commissioner has been given broad authority to promulgate regulations relating to the UIPA, including regulations defining the terms used therein. We must accord substantial deference to those regulations and conclude neither of these is inconsistent with the statutes to which they relate.[3]

---

[3] Both parties have requested we take judicial notice of various documents. Both the Commissioner's request, and his supplemental request, seeking judicial notice

**FACTS**

In 2008, following a lengthy investigation, the California Department of Insurance filed an administrative enforcement action against PacifiCare, alleging it engaged in multiple unfair claims settlement practices described in section 790.03(h), as well as other violations of the Insurance Code. Following an evidentiary hearing, the Commissioner issued a lengthy decision and order, finding PacifiCare engaged in over 900,000 acts and practices in violation of the Insurance Code. As a result, the Commissioner imposed penalties in excess of $173 million.

In July 2014, PacifiCare filed a petition for writ of mandate and complaint for declaratory and injunctive relief in the trial court, challenging the Commissioner's decision and order. Among other things, PacifiCare challenged the validity of three regulations previously promulgated by the Commissioner, and relied upon by him in the prosecution of this action. Those regulations related to a number of specifically defined unfair claims settlement practices. (Reg. 2695.1(a).)

The first challenged regulation is Reg. 2695.1(a), which is part of the preamble to the regulatory article entitled "Fair Claims Settlement Practices Regulations." (Regs. 2695.1—2695.14.) PacifiCare objected to the clause in that regulation describing section 790.03(h) as "enumerat[ing] sixteen claims settlement practices that, when either knowingly committed on a single occasion, or performed with such frequency as to indicate a general business practice, are considered to be unfair claims settlement practices. . . ." PacifiCare claims the regulation's language is inconsistent with section 790.03(h), which it contends does not include the single

of (1) documents comprising legislative history of various statutes and (2) documents evidencing the rulemaking process underlying the Fair Claims Settlement Practices Regulations, are granted. PacifiCare's request for judicial notice is granted with respect to documents comprising legislative history of various statutes, but denied with respect to the former Commissioner's amicus curiae brief filed in connection with *Royal Globe.*

knowing commission of an enumerated act in its definition of an unfair claims settlement practice. As a result, PacifiCare argues that this regulation is invalid.

The second challenged regulation is Reg. 2695.2(l), which defines "'[k]nowingly committed'" for purposes of the fair claims settlement practices regulations as "performed with actual, implied or constructive knowledge, including but not limited to, that which is implied by operation of law." PacifiCare argues this definition is inconsistent with section 790.03(h) because "knowingly," in ordinary parlance, must mean deliberately—a meaning PacifiCare claims is inconsistent with implied or constructive knowledge.

The third challenged regulation is Reg. 2695.2(y), which defines "'[w]illful' or '[w]illfully' when applied to the intent with which an act is done or omitted [as] simply a purpose or willingness to commit the act, or make the omission . . . . It does not require any intent to violate law, or to injure another, or to acquire any advantage." PacifiCare objected to this definition as inconsistent with section 790.035, the statute that sets forth the penalties applicable to violations of section 790.03—including enhanced penalties for "willful" violations. PacifiCare argues this regulation impermissibly blurs the distinction between willful and nonwillful violations, and is inconsistent with the statutory definitions of willful found in the Insurance Code.

In April 2015, PacifiCare moved for judgment on the pleadings on its claim for declaratory relief, seeking a determination that each of the challenged regulations was inconsistent with the relevant underlying statutory language and, therefore, *facially* invalid. The trial court granted PacifiCare's motion with respect to all three regulations, declaring that all three regulations "impermissibly conflict and are inconsistent with . . . . sections 790.03, subdivision (h) and 790.035."

PacifiCare subsequently moved for a preliminary injunction preventing the Commissioner from continuing to enforce the three regulations ruled invalid. The court issued the requested injunction, stating the Commissioner was enjoined from:

5

(1) "enforcing those portions of Regulation 2695.1(a) that base claims settlement violations 'on a single occasion' of conduct;" (2) "enforcing the definition of 'knowingly committed' in Regulation 2695.1(l);" and (3) "enforcing Regulation 2695.2(y), for the purpose of interpreting 'Willful' or 'Willfully' under Insurance Code section 790.035."

In November 2016, in response to the Commissioner's petition for a writ of supersedeas, this court issued an order suspending the injunction pending the resolution of this appeal, without ruling on the merits of the appeal.

## DISCUSSION

1. *Standards of Review*

"'Government Code section 11342.2 provides the general standard of review for determining the validity of administrative regulations. That section states that "[w]henever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless [1] consistent and not in conflict with the statute and [2] reasonably necessary to effectuate the purpose of the statute."'" (*Association of California Ins. Cos. v. Poizner* (2009) 180 Cal.App.4th 1029, 1044 (*Poizner*).)

Applying that standard to this case, we note that section 790.10 expressly authorizes the Commissioner to adopt regulations related to implementation of the UIPA, stating he "shall, from time to time as conditions warrant . . . promulgate reasonable rules and regulations, and amendments and additions thereto, as are necessary to administer [the UIPA]." As our Supreme Court recently noted in *Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376 (*ACIC*), that regulatory authority "appears to be quite broad" (*id.* at p. 390) because "[i]mplied in the phrase 'from time to time as conditions warrant' is a measure of flexibility for the Commissioner to discern when regulation is proper." (*Id.* at p. 391.)

6

Moreover, the Supreme Court explained in *ACIC* that section 790.10's use of the phrase "'as . . . necessary to administer'" does not imply any particular restriction on the scope of the Commissioner's authority. (*ACIC, supra*, 2 Cal.5th at p. 390.) The Court instead looked to "the scope of the word as used in the statutory definition of 'regulation,' which provides that an agency's authority to enforce or administer a statute includes the power to adopt a regulation 'to implement, interpret, or make specific the law enforced or administered by it.'" (*Id.* at p. 392, citing Gov. Code, § 11342.600.)[4]

---

[4]     We reject PacifiCare's contention that *ACIC* is inapposite here. Although *ACIC* does draw a distinction between the Commissioner's rule making authority under section 790.03, subdivision (b)—which prohibits the public dissemination of untrue, deceptive or misleading information by an insurer—and his authority under 790.03(h), we believe the distinction is irrelevant for our purposes. The question in *ACIC* was whether the Commissioner had exceeded his authority by declaring an insurer's incomplete replacement cost estimate to be a prohibited misrepresentation under section 790.03, subdivision (b), when the subdivision itself made no reference to such incomplete estimates. The appellant argued that because the Legislature specifically identified the acts constituting unfair claims settlement practices under section 790.03(h), its failure to similarly "designate incomplete replacement cost estimates as misleading statements" under subdivision (b) of section 790.03 must be viewed as a "conscious choice" to exclude such estimates from the scope of that subdivision. (*ACIC, supra*, 2 Cal.5th at p. 398.)

However, the Supreme Court explained that the Legislature was free to reserve for itself the definition of what acts would qualify as misconduct under one statutory provision, while authorizing the Commissioner to define what acts would qualify under another: "[w]hen the Legislature is confident that it has identified a given problem and the best solution, it may enact its specific remedy into statutory law—as it did with unfair claims settlement practices in section 790.03, subdivision (h). But the Legislature may also choose to grant an administrative agency broad authority to apply its expertise in determining whether and how to address a problem without identifying specific examples of the problem or articulating possible solutions." (*ACIC, supra*, 2 Cal.5th at p. 399.) Thus, because section 790.03, subdivision (b), identified only the general problem of misrepresentations by insurers, without identifying any specific examples, the rulemaking power granted to the Commissioner under the UIPA gave him broader authority to decide what acts would qualify as a violation of that subdivision than he had in connection with section 790.03(h). That distinction, while significant in *ACIC*, is irrelevant here because the regulations before us do not purport to identify the acts that

7

In deciding whether a regulation is consistent with the statutes to which it relates, we must start with the presumption the regulation is valid. (*ACIC, supra*, 2 Cal.5th at p. 389.) And because the issue of consistency "implicate[s] the interpretation of the relevant statutes, [it presents] a question of law on which this court exercises independent judgment." (Id. at pp. 389-390; *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415 ["when an implementing regulation is challenged on the ground that it is 'in conflict with the statute' . . . the issue of statutory construction is a question of law on which a court exercises independent judgment"].)

However, "[i]n exercising our ultimate responsibility to construe the statutory scheme, . . . we ""accord[] great weight and respect"'" to the administrative agency's construction. [Citations.] [¶] How *much* weight to accord the agency's construction depends on the context, a term encompassing both the nature of the statutory issue and characteristics of the agency. [Citation.] Among the factors bearing on the value of the administrative interpretation, two broad categories emerge: factors relating to the agency's technical knowledge and expertise, which tend to suggest the agency has a comparative interpretive advantage over a court; and factors relating to the care with which the interpretation was promulgated, which tend to suggest the agency's interpretation is likely to be correct." (*ACIC, supra*, 2 Cal.5th at p. 390.)

We also consider the extent to which the regulation is "quasi-legislative" as opposed to "interpretive." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 6, fn. 3 (*Yamaha*).) As described in *ACIC*, "Quasi-legislative rules represent 'an authentic form of substantive lawmaking' in which the Legislature has delegated to the agency a portion of its lawmaking power. [Citations.] Because such rules 'have the dignity of statutes,' a court's review of their validity is narrow: 'If

_____

would qualify as unfair claims settlement practices under section 790.03(h). Rather, they construe the statutory language.

8

satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end.'" (*ACIC, supra*, 2 Cal.5th at pp. 396-397.)

By contrast, "an interpretive rule that is devoid of any quasi-legislative authority . . . represents the agency's understanding of the statute's meaning and effect—consequential, but not an exercise of delegated lawmaking power. [Citation.] A court reviewing the validity of an interpretive rule therefore must consider more than simply whether the rule is within the scope of the authority conferred, and whether the rule is reasonably necessary to effectuate the statute's purpose. Rather, a court must also consider whether the administrative interpretation is a proper construction of the statute." (*ACIC, supra*, 2 Cal.5th at p. 397.)

In this case, PacifiCare contends that all three of the regulations it challenges are purely interpretive—and thus entitled to little deference—"because they *define* particular words in sections 790.03(h) and 790.035 and *interpret* the introductory phrase in section 790.03(h)."

However, as stated in *Yamaha*—the case PacifiCare relies upon to support its assertion that all regulations are either "quasi-legislative" or "interpretive"—the distinction is often unclear. In fact, "the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature." (*Yamaha, supra*, 19 Cal.4th at p. 6, fn. 3.) Consequently, "in certain circumstances, a regulation may have both quasi-legislative and interpretive characteristics—'as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms.'" (*ACIC, supra*, 2 Cal.5th at p. 397.)

The fact the Legislature may at times legitimately delegate to administrative agencies the power "to interpret key statutory terms" proves fatal to PacifiCare's claim that all regulations which "*define* particular words" in a statute are necessarily "interpretive," and thus not entitled to deference. As the Supreme Court

9

explained in *ACIC*, section 790.1's broad delegation of regulatory authority to the Commissioner is consistent with an authorization to interpret statutory language: "[w]here, as here, the Legislature uses open-ended language that implicates policy choices of the sort the agency is empowered to make, a court may find the Legislature delegated the task of interpreting or elaborating on the statutory text to the administrative agency." (*ACIC, supra,* 2 Cal.5th at p. 393.) We consequently reject PacifiCare's assertion that these regulations are entitled to little deference simply because they interpret terms used in the statute.

We agree, on the other hand, with the Commissioner's assertion that because PacifiCare has made a *facial* challenge to the validity of each regulation, it can prevail only if the text of the regulation, *on its face,* is inconsistent with the relevant statute[s]. "A facial challenge is '"the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the [law] would be valid*."'" (*T.H. v. San Diego Unified School Dist*. (2004) 122 Cal.App.4th 1267, 1281.)

"To resolve a facial challenge, we consider 'only the text of the measure itself, not its application to the particular circumstances' of this case." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218

(*Today's Fresh Start*).) [5] We consequently reject PacifiCare's analysis relating to the propriety of the Commissioner's creation of these regulations. [6]

With these standards in mind, we consider the UIPA and the validity of the challenged regulations.

2. *The UIPA and Section 790.03(h)*

The UIPA "was adopted in 1959, and was patterned after the National Association of Insurance Commissioners' model legislation." (*Royal Globe, supra*, 23 Cal.3d. at p. 885.) Its purpose "is 'to regulate trade practices in the business of insurance . . . by defining . . . such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.'" (*Id.* at pp. 884-885.) The UIPA authorizes the Commissioner to investigate those engaged in the insurance business to determine "whether insurance companies are or have been engaged 'in any . . . deceptive act or practice prohibited by Section 790.03.'" (*ACIC, supra*, 2 Cal.5th at p. 387).

The UIPA's operative provision is section 790.02, which states: "No person shall engage in this State in any trade practice which is defined in this article as, or

---

[5]     PacifiCare argues against the application of this "exacting" standard (*Today's Fresh Start, supra*, 57 Cal.4th at p. 218) in the context of a regulatory challenge. It argues that the cases relied upon by the Commissioner are "not relevant because they involve challenges to *statutes* or *ordinances*, not regulations as inconsistent with statute." PacifiCare does not, however, explain why the standard is inappropriate or unworkable in this context, nor does it identify any alternative standard applicable to facial challenges to regulations.

[6]     We cannot consider PacifiCare's factual claims relating to the underlying proceedings and the effect of the challenged regulations on those proceedings. PacifiCare brought a *facial* challenge to the validity of these regulations and obtained the order declaring the regulations invalid as a result of its motion for judgment on the pleadings, before any fact finding by the trial court had occurred. It, therefore, cannot rely on disputed contentions about the merits of the underlying proceedings to support that order.

11

determined pursuant to this article to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Section 790.03 specifies and describes the prohibited "unfair methods of competition and unfair and deceptive *acts or practices* in the business of insurance." (Italics added.)

In 1971, the Legislature enacted section 790.10, requiring the Commissioner, "from time to time as conditions warrant, after notice and public hearing, [to] promulgate reasonable rules and regulations, and amendments and additions thereto, as are necessary to administer this article."

Section 790.03(h), the specific subdivision at issue in this case, was enacted a year later. It was based on an amendment to the model legislation. However, California modified the amendment's language. (*Royal Globe, supra*, 23 Cal.3d. at p. 885, 890, fn. 9 ["The model act does not contain the word 'Knowingly'"].) Section 790.03(h) prohibits sixteen specific "unfair claims settlement practices" which are prohibited when "[k]nowingly commit[ed] or perform[ed] with such frequency as to indicate a general business practice." (§ 790.03(h).)[7]

---

[7] The 16 prohibited activities are: "(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue. [¶] (2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies. [¶] (3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. [¶] (4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured. [¶] (5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear. [¶] (6) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered. [¶] (7) Attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he or she was entitled by reference to written or printed advertising material accompanying or made part of an application. [¶] (8) Attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured, his or her representative, agent, or broker. [¶] (9) Failing, after payment of a claim, to inform

12

Definitional statutes are intended to provide clarity and consistency in statutory language, and the California Legislature is generally adept at drafting them. Unfortunately, section 790.03(h) is conceptually clear—painting a vivid picture of the types of insurance company misconduct it seeks to curtail—but syntactically challenged.

The key question has long been whether section 790.03(h) defines one or two discrete categories of punishable conduct. Had the Legislature elected to employ commas in either of two ways in the subdivision's main clause, that debate might more easily be resolved in favor of one side or the other.[8] But it did neither. We consequently can draw no inferences based on the placement of commas.

_____

insureds or beneficiaries, upon request by them, of the coverage under which payment has been made. [¶] (10) Making known to insureds or claimants a practice of the insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration. [¶] (11) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information. [¶] (12) Failing to settle claims promptly, where liability has become apparent, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage. [¶] (13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement. [¶] (14) Directly advising a claimant not to obtain the services of an attorney. [¶] (15) Misleading a claimant as to the applicable statute of limitations. [¶] [and] (16) Delaying the payment or provision of hospital, medical, or surgical benefits for services provided with respect to acquired immune deficiency syndrome or AIDS-related complex for more than 60 days after the insurer has received a claim for those benefits, where the delay in claim payment is for the purpose of investigating whether the condition preexisted the coverage."

[8] Had the Legislature inserted commas so that the main clause read "[k]nowingly committing, or performing with such frequency as to indicate a general business practice, any of the following unfair claims settlement practices," anyone among us could easily determine that the statute referred to two alternate categories of punishable conduct. Likewise, had the Legislature placed the first of those two commas, so that the main clause read "[k]nowingly committing or performing, with such frequency as to indicate a general business practice, any of the following unfair claims

13

Adding fuel to the fire is the fact that a main clause of section 790.03 employs the word "practice" twice in reference to what are apparently two different activities—an insurer's "general business practice" and an "unfair claims settlement practice[]." Although PacifiCare argues the second reference, to an "unfair claims settlement practice" must also refer to an insurer's "general business practice," we are not persuaded. In the context of both the UIPA generally, which regulates prohibited "trade practice[s]" (§ 790.02), and section 790.03 specifically, which defines "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance" (§ 790.03), we believe the phrase "unfair claims settlement practices" refers to practices that exist in the insurance industry generally. (See *People v. Zambia* (2011) 51 Cal.4th 965, 972 [""'the words [of a statute] must be construed in context'""].) Thus, an individual insurer would engage in a listed "practice" by just once committing the described misconduct.

Finally, we cannot ignore the fact that the 16 unfair claims settlement practices listed in section 790.03(h) are described in dissimilar ways. Several of the 16 practices refer to multiple "claimants" and "claims," which suggests the wrongful practice would involve multiple incidents of wrongdoing. Others reference a "claimant" or "claim," suggesting the practice can be committed on a single occasion. Still others are described in some combination of plural and singular language (e.g., 790.03(h)(8)). There is even one practice which appears to qualify as both a single act of wrongdoing and a general business practice (§ 790.03(h)(3).) Such draftsmanship raises what has become a recurring question: Did the Legislature intend to authorize the Commissioner to investigate and regulate only established *patterns* of unfair claims settlement practices, or did it intend to authorize enforcement activities based on *single acts* of misconduct by

settlement practices," anyone would understand that the statute referred to a single category of conduct.

14

an insurer? As we will discuss further below, we conclude the Legislature intended to empower the Commissioner to take appropriate enforcement action in response to an insurer's single, knowing commission of a prohibited practice, and also in cases where the insurer engages in repetitive acts of misconduct as a general business practice.

We consider many factors in reaching this conclusion, but we are initially struck by the fact that the Legislature, in the language it chose to introduce section 790.03, included both "unfair and deceptive acts or practices"[9] in its litany of prohibited conduct. So the Legislature's overarching intent on this topic seems clear to us from the outset. The Supreme Court also recently concluded that the Commissioner, pursuant to the powers vested in his office by the UIPA, has enforcement authority whenever an insurer has engaged in any "'deceptive act or practice prohibited by Section 790.03 . . . .'" (*ACIC, supra*, 2 Cal.5th at p. 387.)

3.      *Royal Globe, Moradi-Shalal and Subsequent Legislation*

In the years following its enactment, section 790.03(h) generated no small amount of debate as to its meaning. Finally, in 1979, the Supreme Court decided *Royal Globe*, in which it resolved several disputes about how the statutory scheme embodied in the UIPA was intended to operate. First, the court held that section 790.03(h) was not solely a basis for imposing administrative penalties. Instead, a third party claimant could bring a direct civil action against an insurer to impose liability based on its commission of the unfair practices described in the provision. (*Royal Globe, supra*, 23 Cal.3d. at pp. 885-888.) The court also held that "a single violation knowingly committed is a sufficient basis for such an action," and thus it was not necessary to prove the insurer engaged in an alleged violation as a general business practice. (*Id.* at p. 891). Finally, the court held that the third party plaintiff could not sue both the insured and the insurer

---

[9]      "The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." (§ 790.03.)

in the same action, but must instead wait to sue the insurer until the liability of the insured "is first determined." (*Id.* at p. 892; see *Moradi-Shalal, supra,* 46 Cal.3d. at p. 294 [identifying what the Court characterizes as the three separate holdings of *Royal Globe*].)

Nine years later, in *Moradi-Shalal*, the Supreme Court reversed *Royal Globe's* holding that section 790.03(h) gave rise to a private right of action because "[n]either section 790.03 nor section 790.09 was intended to create a private civil cause of action against an insurer that commits one of the various acts listed in section 790.03, subdivision (h)." (*Moradi-Shalal, supra,* 46 Cal.3d. at p. 304.) At the same time the Court cautioned "that our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the Insurance Commissioner and the courts to continue to enforce the laws forbidding such practices to the full extent consistent with our opinion." (*Ibid.*)

In the wake of *Moradi-Shalal*, the Legislature enacted section 790.035, which authorized additional financial penalties for violations of section 790.03, such penalties to be imposed "for each act." (§ 790.035, subd. (a).) The Legislature also gave the Commissioner "discretion to establish what constitutes an act" for purposes of assessing the new penalties, except that "when the issuance, amendment or servicing of a policy or endorsement is inadvertent, all of those acts shall be a single act . . . ." (*Ibid.*)

In 1990, the Legislature enacted section 12921.1, which directed the Commissioner to "establish a program on or before July 1, 1991, to investigate complaints and respond to inquiries . . . , and, when warranted, to bring enforcement actions against insurers." The program requires the Commissioner to focus on individual complaints from consumers about insurers, obligating him to provide the public with a "toll-free telephone number . . . dedicated to the handling of complaints and inquiries" (§ 12921.1, subd. (a)(1)), as well as a "simple, standardized complaint form designed to assure that complaints will be properly registered and tracked." (§ 12921.1, subd. (a)(3).)

16

The program also requires the Commissioner to establish "average processing times for each step of complaint mediation, investigation, and enforcement" which shall be consistent with [the UIPA].) (§ 12921.1, subd. (6).)

In December 1992, the Commissioner filed the Fair Claims Settlement Practices Regulations (Regs. 2695.1 et. seq.), which include the regulations challenged in this case. Those regulations took effect in January 1993.

4.      *PacifiCare's Challenge to Reg. 2695.1*

The first of the three regulations challenged by PacifiCare is Reg. 2695.1, which is identified as the "[p]reamble" to the Fair Claims Settlement Practice Regulations. PacifiCare objects specifically to the italicized language in subdivision (a) of the regulation, which describes section 790.03(h) as "enumerat[ing] sixteen claims settlement practices that, *when either knowingly committed on a single occasion, or performed with such frequency as to indicate a general business practice*, are considered to be unfair claims settlement practices . . . prohibited by this section of the California Insurance Code." (Italics added.)

PacifiCare contends the italicized language of the regulation is inconsistent with section 790.03(h) because the statute governs only an insurer's pattern of knowing violations, not its commission of any single violation. We disagree. Even if we accorded no deference to the Commissioner's interpretation of the statutory language, we would conclude his interpretation is correct.

A.      *Royal Globe Is Binding on the Point*

When squarely presented with the question of whether section 790.03(h) applies to "a single violation knowingly committed," the Supreme Court held in *Royal Globe* that it did. (*Royal Globe, supra,* 23 Cal.3d at p. 890.) And although the Supreme Court overruled *Royal Globe* in *Moradi-Shalal*, it did so only with respect to *Royal Globe's* holding that section 790.03(h) established a private right of action in favor of a

17

third party. [10] (*Moradi-Shalal, supra*, 46 Cal.3d. at p. 303-304 ["the interpretive difficulties and complex public policy choices arising under *Royal Globe* result solely from its conclusion that the Legislature intended to confer a private right of action for violation of section 790.03"].)

Indeed, at the outset of its opinion in *Moradi-Shalal,* the Supreme Court narrowly framed the issue before it to be whether or not "a private litigant could bring an action to impose civil liability on an insurer for engaging in unfair claims settlement practices." (*Moradi-Shalal*, *supra,* 46 Cal.3d at p. 294.) The court thereafter discussed other issues that had been resolved in *Royal Globe*, including the "single act" liability theory. We acknowledge that the court appeared to struggle with the propriety of its *Royal Globe* holding that "an action under section 790.03 could be based upon a single wrongful act" (*Moradi-Shalal,* at p. 303), but we conclude, after analyzing the relevant language in its proper context, that the court did not overrule *Royal Globe* on this issue. Rather, it observed that the significant disagreement expressed by the courts of other states with certain principles set forth in *Royal Globe* "strongly suggests we erred in our contrary holding." (*Moradi-Shalal,* at p. 303.) The court then concluded "[i]t seems evident that resolution of these issues regarding the application of *Royal Globe* involves a difficult weighing of competing policies," and suggested "[s]uch a determination is more properly made by the Legislature." (*Moradi-Shalal,* at pp. 303-304.)

Twenty-five years later, in *Zhang*, the Supreme Court clarified its view as to the scope of its ruling in *Moradi-Shalal*: ". . . we held that when the Legislature

---

[10] Because *Moradi-Shalal* was given prospective effect only (*Moradi-Shalal, supra*, 46 Cal.3d. at p. 305), the Court also clarified *Royal Globe's* holding that a third party claim could not be brought against the insurer "'until the action between the injured party and the insured is concluded.'" The Court held that only a judgment against the insured, not a settlement, was a sufficient "conclusion" triggering the right to bring the third party action. (*Moradi-Shalal, supra*, 46 Cal.3d. at pp. 305-306.)

enacted the UIPA, it did not intend to create a private cause of action for commission of the various unfair practices listed in Insurance Code section 790.03 subdivision (h)." (*Zhang, supra,* 57 Cal.4th. at p. 368.)  In her concurring opinion in the same case, Justice Werdeger mirrored this view when she wrote ". . . *Moradi-Shalal* confined itself to succinctly repudiating *Royal Globe's* discernment of a private right of action in the four corners of the (UIPA) itself."  (See *Id.* at p. 385 (conc. opn. of Werdeger, J.).)

Because we find *Moradi-Shalal* did not overrule *Royal Globe* on the issue of whether a single violation, knowingly committed, would qualify as an unfair claim settlement practice under section 790.03(h), its negative commentary on the point is not binding precedent as we consider the issue. "'[A] decision is not authority for what is *said* in the opinion but only for the points *actually involved* and actually decided'" (*Trope v. Katz* (1995) 11 Cal.4th 274, 284 (*Trope*), quoting *Childers v. Childers* (1946) 74 Cal.App.2d 56, 61; see *Western Landscape Construction v. Bank of America* (1997) 58 Cal.App.4th 57, 61 ["To determine the precedential value of a statement in an opinion, the language of that statement must be compared with the facts of the case and the issues raised.  Only statements necessary to the decision are binding precedents; explanatory observations are not binding precedent"].)  As the Supreme Court has emphasized, "[a] precedent cannot be overruled in dictum." (*Trope, supra*, 11 Cal.4th at p. 287.) Complex issues, such as those presented here, can be fairly resolved only when they are thoroughly analyzed, briefed and argued.  This case provides an excellent working example as to why the dicta rule exists.

We cannot read the Supreme Court's mind.  We can only apply its precedents—no matter how old or how often criticized a precedent may be.  So *Royal Globe* remains binding on the issue of whether 790.03(h) applies to "a single violation knowingly committed" (*Royal Globe, supra*, 23 Cal.3d at p. 891), and fully supports the Commissioner's interpretation of the challenged language in Reg. 2695.1(a).

*B.*     *Royal Globe's Interpretation of the Statutory Language Is Correct*

Even if *Royal Globe* were not binding on the point, we would agree with its conclusion that section 790.03(h) applies to an insurer's single knowing commission of the prohibited conduct.   Because the language of section 790.03(h) appears ambiguous, we apply well-settled principles of statutory interpretation  in ascertaining its meaning: "[A] court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A construction making some words surplusage is to be avoided.  The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]  Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.  [Citation.] . . . Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment and Housing Com.* (1987) 43 Cal.3d. 1379, 1386-1387.)

Focusing first on the provision itself, we begin by setting aside all arguments regarding the potential impact of commas.  As we have already observed, the Legislature could have employed commas in one way or another to clarify whether the phrase "[k]nowingly committing or performing with such frequency as to indicate a general business practice" refers to two categories of violations in section 790.03(h), or to only one.  But the provision says what it says, and it is our duty to interpret its meaning.

As noted above, we begin our analysis at the beginning of section 790.03. Its introductory language speaks to "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance."  Acts or practices.  The words are used in the disjunctive.  This strongly suggests both acts and practices are prohibited under section 790.03 if they fall within the statutory definitions.

20

We reject PacifiCare's contention that an "unfair claims settlement *practice*" must refer to an insurer's pattern of conduct, rather than to any individual act. In the context of the UIPA, and section 790.03 specifically, a prohibited "practice" is an activity that occurs within the insurance industry generally. An insurer engages in such a prohibited "practice" by committing the described act once or more than once. Applying the UIPA language literally, once is enough to invoke its provisions.

We are also unpersuaded by PacifiCare's suggestion—seemingly borrowed from the dissent in *Royal Globe*—that drawing a distinction between the knowing commission of a prohibited practice on a single occasion, and the performance of that practice on a regular basis, would be inconsistent with the statute's description of the prohibited acts: "'one could not *unknowingly* either 'commit' or 'perform' a prohibited act under [section 790.03(h)], thus strongly suggesting that the term 'knowingly' applies to both 'committing' [and] 'performing' and that they are to be read together.'" (Quoting *Royal Globe, supra*, 23 Cal.3d. at p. 894 (conc. & dis. opn. of Richardson, J.).)

That assertion is unpersuasive because six of the unfair claims practices listed in section 790.03(h) involve a failure to perform a specific *act*—e.g., "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." (§ 790.03(h)(2).) Such omissions might easily be, and perhaps often are, accomplished "unknowingly." Moreover, an affirmative "misrepresentation," which is also included in the list of unfair claims settlement practice, can be committed unknowingly.

We agree with the Commissioner's assertion that PacifiCare's interpretation of the provision would create a surplusage—which is to be avoided if possible. In PacifiCare's view, section 790.03(h) defines an unfair settlement practice as something that must be "both knowingly performed *and* constitute a general business practice"—thus effectively reading out the word "'commit[ed]'" as an unnecessary alternative to "'perform[ed].'" We are not persuaded by PacifiCare's assertion that the

21

two words operate as necessary alternatives in its version of the provision because "the different types of unfair practices enumerated under section 790.03(h) require that its opening sentence cover two different ways of engaging in them."  While it may be true that a misrepresentation can be "'commit[ed]'" rather than "'perform[ed],'" nothing compels that usage or understanding; and there is no logical support for PacifiCare's assertion that "the practice of '[f]ailing to settle claims promptly'" would always be "'perform[ed]'" rather than "'commit[ed].'"

Turning to the issue of how the language in section 790.03(h) compares with that in other statutes, PacifiCare contends we must infer the Legislature did not intend to distinguish between a "[k]nowingly commit[ed]" violation and one that is "perform[ed] with such frequency as to indicate a general business practice" in section 790.03(h) because the Legislature has regularly employed different language to draw that distinction in other statutes.[11]

But PacifiCare fatally undermines its own position by also citing Labor Code section 5814.6—a statute that uses specific language to restrict the imposition of an administrative penalty to situations where the perpetrator has acted *both* knowingly *and* frequently:  "[a]ny employer or insurer that knowingly violates Section 5814 with a frequency that indicates a general business practice is liable for administrative penalties . . . ."  (Lab. Code, § 5814.6, subd. (a).)  Although PacifiCare cites that statue in support of its assertion "there is nothing unusual about requiring that conduct be performed *both* 'knowingly' and 'with a frequency that indicates a general business

_____

[11]    (Comparing § 790.03(h) with §§ 789.3, subd. (e), 10123.31, subd. (c), 10140.5, subd. (c), 10192.165, subd. (b)(4), 10199.7, subd. (d), 10509.9, subd. (d), and 10718.5, subd. (d); see also Health & Saf. Code, §§ 1367.03, subd. (g)(3) and 1368.04, subd. (b), both applicable to "health care service plan[s].")  (See *People v. Trevino* (2001) 26 Cal.4th 237, 242 ["When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning"].)

22

practice,'" the real significance of Labor Code section 5814.6 is that it demonstrates the Legislature has also employed different language than that found in section 790.03(h) when it wanted to restrict the imposition of administrative penalties to situations where the perpetrator has *both* knowingly *and* regularly committed the described violation.

The fact the Legislature has used somewhat different language in both situations—when it wanted to identify two separate categories of wrongful conduct, and when it wanted to specify only one—precludes us from drawing any inference from its failure to have done either in section 790.03(h). We therefore draw no such inference here.

On the other hand, PacifiCare's extensive list of Insurance Code penalty statutes that each draw a clear distinction between a single "knowing" violation and a pattern of violations *is* persuasive, albeit for a different reason. What those statutes demonstrate is that in every case in which the Legislature has given the Commissioner authority to impose penalties against an insurer for violating provisions of the Insurance Code in contexts analogous to section 790.03(h), it has specifically authorized a penalty for the insurer's single knowing commission of the prohibited act.[12] We cannot find

---

[12] Section 789.3 authorizes the Insurance Commissioner to impose administrative penalties against an insurer who violates the article (governing insurance transactions that involve persons 65 and over), but imposes significantly higher penalties against an insurer who either "commits a knowing violation" or "violates [the article] with a frequency as to indicate a general business practice." (§ 789.3, subd. (e).) Section 10123.31 is similar, authorizing the imposition of a small penalty against a self-insured employee welfare benefit plan for any violation of section 10123.3, but providing for a substantially larger penalty in the case of either a knowing violation or a frequent pattern of violations. (§ 10123.31, subds. (a) & (c).) Section 10140.5 imposes a similar penalty structure against a life or disability insurer who violates section 10140. (§ 10140.5, subds. (a) & (c).) Section 10192.165 authorizes the Commissioner to penalize a violation of the chapter (governing Medicare supplement policies), but to assess more significant penalties for either a knowing violation, or a general practice of such violations. (§ 10192.165, subd. (b)(4).) Section 10199.7 allows the assessment of a penalty for any violation of the chapter, but imposes significantly higher penalties against an insurer who commits either a knowing violation, or engages in a general practice of

23

another statute which suggests that a single, knowing violation of the Insurance Code by an insurer would be shielded from any possible administrative penalty.[13] Nor can we imagine, given the public policy discussed above, why it should be.

We concede all of these statutes were enacted after section 790.03(h), and thus none of these statutes provide direct evidence of how the Legislature viewed this issue in 1972. However, section 12926, enacted in 1935, suggests that by 1972, the Legislature not only had a long-established policy of zero-tolerance for insurer violations of the Insurance Code, but also that it had placed the Commissioner in charge of enforcement of the Code's provisions: "[t]he commissioner shall require from every insurer *a full compliance with all the provisions of this code*." (§ 12926, italics added.) Consistent with that policy, the Legislature gave the Commissioner broad regulatory authority to administer the UIPA in 1971. (§ 790.10.)

---

such violations. (§ 10199.7, subd. (d).) Section 10509.9 authorizes penalties for violations of statutes governing the requirements for replacement of life insurance and annuity policies, but imposes higher penalties for either "a knowing violation" or violations "with a frequency as to indicate a general business practice." (§ 10509.9, subd. (d).) Section 10718.5, subdivision (d), authorizes the Commissioner to impose additional penalties against an insurer that "knowingly or as a general business practice" violates the chapter, including "suspend[ing] the carrier's certificate of authority to transact disability insurance." (§ 10718.5, subd. (d).)

[13] Labor Code section 5814.6 establishes no exception to this rule for purposes of the Labor Code. The statute, which is an aspect of the worker's compensation law, authorizes large administrative penalties—up to $400,000—against "[a]ny employer or insurer that knowingly violates Section 5814 with a frequency that indicates a general business practice . . . ." (Lab. Code, § 5814.6, subd. (a).) However, the Labor Code section mentioned in the statute is itself a penalty provision, which imposes significantly smaller penalties in any single case where the "payment of compensation has been unreasonably delayed or refused." (*Ibid.*) Thus, even in this context, the Legislature has expressly authorized the imposition of an administrative penalty against an insurer based on a single violation.

24

We find the intent of the Legislature on this issue to be clear. Construing section 790.03(h) in the manner suggested by PacifiCare—which would effectively prohibit the Commissioner from taking any enforcement action whatsoever against an insurer whose misconduct does not involve such an established history of wrongdoing that it could be fairly characterized as a general business practice—would be inconsistent with these clear Legislative mandates.[14]

Moreover, adopting PacifiCare's interpretation of section 790.03(h) would require us to find the Legislature *intended to limit enforcement of the provision* even as it enacted it—which appears to us inconsistent with the Legislature's intent as well as common sense. As already noted, the Legislature did not adopt the model provision as proposed; it instead added the word "[k]knowingly." (*Royal Globe, supra*, 23 Cal.3d. at p. 890, fn. 9.) What was the Legislature's purpose in adding that word? The model provision's original language would have prohibited "committing or performing [any of the listed acts] with such frequency as to indicate a general business practice"—language which seems to describe only a single category of misconduct. There would be no point in distinguishing between the insurer's single commission of a proscribed act, and its frequent performance of that same act, if the punishment for both was the same. But when construed in the manner urged by the Commissioner, the Legislature's addition of the word "[k]nowingly" strengthens section 790.03(h) and the Commissioner's enforcement authority by allowing an insurer to be penalized for a single knowing

---

[14] PacifiCare's interpretation of the provision would not only preclude the imposition of a penalty for an insurer's "*single* knowing commission" of a violation, it would also preclude a penalty in any case in which an insurer engaged in *repeated* knowing violations, which did not rise to the level of a "general business practice."

violation, as well as for a pattern of violations that would be punishable under the model provision. [15]

By contrast, under PacifiCare's interpretation of section 790.03(h), the Legislature's inclusion of the word "[k]nowingly" would significantly weaken the model provision. While the model language would have established a violation in every case in which an insurer engaged in the prohibited conduct with sufficient frequency—whether intentional or not—PacifiCare's interpretation would require us to find the Legislature intended to restrict enforcement and possible penalties to those cases in which the Commissioner could prove not only that an insurer had engaged in a general business practice of misconduct, but also that its pattern of violations was intentional. Hence, an insurer's inadvertent but regular commission of unfair claims settlement practices, even if engaged in so frequently as to constitute a general business practice, would be insulated from any penalty. In the absence of evidence the Legislature intended such a restrictive result, we cannot infer it in light of the dictate of section 12926: "The commissioner shall require from every insurer a full compliance with all the provisions of this code." (*Ibid.*)

Because PacifiCare's interpretation of the provision would exclude inadvertent violations entirely, we also conclude it is inconsistent with section 790.035, which explicitly includes an insurer's "inadvertent" conduct in the "servicing of a policy" within the "acts" that are subject to enforcement activity and possible penalties

---

[15] Amici curiae acknowledge that a subsequent amendment to the model legislation expressly authorizes the imposition of penalties for an insurer's single, intentional commission of an unfair claims settlement practice, as well as its general business practice of engaging in the conduct. (See Unfair Claims Settlement Practices Act, § 3, subds. A & B, at <http://www.naic.org/store/free/MDL-900.pdf> (as of September 20, 2018.) Amici curiae contend this cannot be the rule in California, however, because our Legislature never separately adopted that amended model language. That assertion seems to us to beg the question; it assumes what it is trying to prove.

under section 790.03. Section 810, subdivision (a), (relating to another topic) defines the "servic[ing]" of a policy as including "[a]djustment and payment of losses." Applying that definition here leads us to the conclusion that section 790.035 authorizes penalties for even inadvertent wrongs committed in the context of settling claims.

PacifiCare contends that because section 790.035 was enacted in 1989, it cannot be relied upon to clarify the meaning of section 790.03(h), as enacted in 1972. We disagree. Where apparent conflicts exist within a statutory scheme, later enacted provisions will prevail. "Statutes must be construed with reference to the entire statutory scheme of which they are a part [citation] so as to harmonize their effect in conformity with legislative intent [citations]. Insofar as it is possible to do so, seemingly conflicting or inconsistent statutes will be harmonized so as to give effect to each. [Citation.] When, however, conflicting statutes cannot be reconciled, the later enactments supersede the earlier ones." (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757.)

In this regard, section 790.035 is significant not only because it expressly includes an insurer's inadvertent commission of claims-handling misconduct within the scope of punishable acts—which is inconsistent with PacifiCare's interpretation of section 790.03(h)—but also because it gives the Commissioner discretion to define what constitutes such an "act" for enforcement purposes. That broad delegation of discretion suggests that even if the Legislature did not believe *Royal Globe* remained binding authority on the question of whether an insurer's single knowing commission of a prohibited practice would qualify as a violation of section 790.03(h) when it enacted section 790.035, its intention was to delegate authority to the Commissioner to decide that question.

Thus, even if it were not clear the Legislature intended to penalize an insurer's inadvertent wrongful claims-handling practices when it enacted section 790.03(h) in 1972, or that it intended to penalize an insurer's single knowing commission

27

of such a practice, its enactment of section 790.035 demonstrates that by 1989, in the wake of *Moradi-Shalal*, its intention was to confer broad discretion to the Commissioner to establish policy and appropriate regulations related to those points.

Section 790.035, along with other statutes including section 12926 (requiring the Commissioner to fully enforce all provisions of the Insurance Code against insurers), section 790.10 (delegating broad regulatory authority over the UIPA to the Commissioner), and section 12921.1 (requiring the Commissioner to establish a program to process individual complaints against insurers), reflect that our Legislature has maintained a consistent policy—both before and after its enactment of section 790.03(h)—requiring insurers to comply fully with all provisions of the law. At the same time, the Legislature has consistently delegated authority to the Commissioner to enforce such compliance.

PacifiCare's interpretation of section 790.03(h) is not only internally problematic, it also stands in contrast to virtually every other statute the Legislature has enacted in connection with (1) enforcement of the Insurance Code against insurers generally; (2) enforcement of the UIPA in particular; and (3) the imposition of administrative penalties against insurers in other contexts. We consequently reject that interpretation in favor of what we believe to be the interpretation more consistent with the overall statutory and regulatory scheme.

We conclude that section 790.03(h), properly construed, defines an unfair claims settlement practice to be either an insurer's single knowing commission of the described conduct, or its performance of the conduct "with such frequency as to indicate a general business practice." Consequently, we hold the trial court erred in determining Reg. 2695.1(a) is inconsistent with the statute.

5.    *Regulatory Definitions of '"Knowingly committed"' and "'Willful' or 'Willfully"'*

The terms "knowingly committed," "willful," and "willfully" are not defined in the UIPA. Thus, the Commissioner's broad mandate to administer the UIPA

28

(*ACIC, supra*, 2 Cal.5th at p. 390, 392), provides him with authority to interpret those undefined terms in the context of the act.  (See *Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011 [holding that state board had authority to interpret terms in a statute prohibiting unlicensed persons from using titles "'likely to be confused with'" licensed titles]; *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 362 [administrative agency with rulemaking power is authorized to "'fill up the details'" of a statutory scheme].)

As the Commissioner points out, he engaged in an extensive, formal rulemaking process in the course of promulgating these regulations.  That careful consideration, combined with the Commissioner's expertise in the area, weighs in favor of according significant deference to the Commissioner's interpretation of the terms (*ACIC, supra*, 2 Cal.5th at p. 390), and we do so.

A.    *'"Knowingly committed"'*

Reg. 2695.2(l) states "'[k]nowingly committed' means performed with actual, implied or constructive knowledge, including, but not limited to, that which is implied by operation of law."

Quoting *Hammond v. Agran* (1999) 76 Cal.App.4th 1181, 1189, PacifiCare argues that "in the absence of specifically defined meaning, a court looks to the plain meaning of a word as understood by the ordinary person, which would typically be a dictionary definition."  It then relies on Black's Law Dictionary to define "knowing" as "Having or showing awareness or understanding" or "Deliberate."  (Black's Law Dict. (10th ed. 2014) p. 1003.)  But we are not attempting here to define a statutory term on a blank slate.  Our task is to ascertain whether the Commissioner's definition, to which we give deference, is invalid.

We agree with PacifiCare that "[k]nowingly comitt[ing]" an act implies the act was done deliberately.  (See *Royal Globe, supra,* 23 Cal.3d. at p. 891 [a litigant must "demonstrate that the insurer acted deliberately"].)  But we disagree with PacifiCare's

29

contention that Reg. 2695.2(l)'s inclusion of implied and constructive knowledge would be inconsistent with the need to establish deliberate conduct by an insurer.

The regulation defines the knowledge of an institution or entity, rather than any individual, and it is consistent with traditional principles establishing corporate knowledge. As a general rule, an institution or entity acts "knowingly"—or deliberately—based on the knowledge or deliberate conduct of those authorized to act on its behalf. "'A corporation, of course, can acquire knowledge only through its officers and agents. Generally, the knowledge of a corporate officer within the scope of his employment is the knowledge of the corporation.'" (*Meyer v. Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 264; Civ. Code, § 2332 [knowledge of agent is imputed to principal].) Moreover, a corporation can be held responsible for knowing information dispersed among its employees. (*People v. Forest E. Olson, Inc*. (1982) 137 Cal.App.3d 137, 139-140.)

The Commissioner points out that the Labor Commissioner has employed a similar definition of "knowingly" for the purpose of implementing regulatory penalties under the worker's compensation law: "A corporation has knowledge of the facts an employee receives while acting within the scope of his or her authority. A corporation has knowledge of information contained in its records and of the actions of its employees performed in the scope and course of employment." (Cal. Code Regs., tit. 8, § 10112.1.)

The Commissioner also argues that the inclusion of imputed and constructive knowledge in the definition of "knowingly" is necessary to effectuate the purposes of section 790.03(h) because it creates incentives for insurers to "make all proper inquiries and to exercise diligence" in the claims settlement process. Restricting the definition of "knowingly" to one particular individual's actual knowledge "would 'fail to take into account that . . . many people handle a claim, and an unfair practice can be committed by cumulative acts, not simply the intentional act of one person.'" These arguments are reasonable and reflect the Commissioner's particular expertise in the area

30

of regulating insurance claims practices. We consequently accord them significant weight.

We are unpersuaded by PacifiCare's suggestion the inclusion of implied or constructive knowledge within the meaning of "'[k]nowingly committed'" "effectively writes out any scienter element from the statute" and allows an insurer to be penalized for inadvertent acts. PacifiCare bases this argument on what it asserts was the Commissioner's unfair application of this rule in the instant case, a disputed factual contention we cannot consider since this is a facial challenge to the regulation. Although it may be true that Reg. 2695.2(l) could be misapplied in an individual case—and even that it may have been misapplied in this one—our sole concern here is the propriety of the trial court's injunction declaring the regulation to be invalid because it is inconsistent with the language and purpose of section 790.03(h). The issuance of that injunction reflected a legal conclusion, not a factual one, and it cannot be supported by reference to the facts of any individual case. It cannot be supported by hypothesizing a possible improper application of the regulation.

For all of the foregoing reasons, we conclude that Reg. 2695.2(l), which defines "'[k]nowingly committed'" for purposes of section 790.03(h), is valid. We therefore reverse the trial court's injunction prohibiting its enforcement.

### B. "'Willful' or 'Willfully'"

Reg. 2695.2(y) states: "'Willful' or 'Willfully' when applied to the intent with which an act is done or omitted means simply a purpose or willingness to commit the act, or make the omission referred to in the California Insurance Code or this subchapter. It does not require any intent to violate law, or to injure another, or to acquire any advantage." This language mirrors that of Penal Code section 7, subdivision (1).[16]

---

[16] Penal Code section 7, subdivision (1), states: "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or

PacifiCare persuaded the trial court this regulation was invalid because it "is inconsistent with the two-tier penalty scheme in Insurance Code section 790.035, which fixes a lower maximum penalty for non-willful acts than for willful acts." As the trial court explained, "[d]efining 'willful' as a mere 'willingness to commit the act, or make the omission' referenced in the Insurance Code [citation] renders meaningless and blurs the distinction between willful and non-willful. [Citation.] Additionally, the scope of the regulation is impermissibly broad because it purports to encompass any acts or omissions referenced in the entire California Insurance Code, even where 'willful' and 'willfully' have already been defined."

In support of the first proposition, PacifiCare relies on *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174 (*Kwan*). In *Kwan*, the court held that in the circumstances of that case, a jury instruction defining willful as "'simply a purpose or willingness to commit the act or to make the omission in question'" (*id.* at 181) operated inconsistently with the two-tiered penalty provision of the Song-Beverly Consumer Warranty Act because it "'would render meaningless or inoperative the Act's distinction between willful and nonwillful violations.'" (*Id.* at p. 184.) However, *Kwan* is distinguishable, both factually and legally.

The Song-Beverly Consumer Warranty Act, more commonly referred to as the "automobile 'lemon law,'" (*Duale v. Mercedes-Benz USA, LLC* (2007) 148 Cal.App.4th 718, 721), imposes various obligations on automobile dealers, including an obligation to replace or refund the cost of any new vehicle if recurring problems cannot be satisfactorily repaired after multiple attempts. (Civ. Code, §§ 1790, 1793.2, subd. (d)(2).) The act not only imposes liability for compensatory damages on a dealer

willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage."

32

who fails to comply with any obligation of the act, it imposes additional civil penalties if the dealer's failure to comply is "willful." (Civ. Code, § 1794, subds. (a), (c).)

In *Kwan*, the jury imposed a penalty on the dealer, despite its manager's claim that his failure to offer the plaintiff either a refund or a replacement vehicle was based on his reasonable belief that the plaintiff had been satisfied by the dealer's final repair of the vehicle. The dealer argued that in light of that contention, the jury instruction on willfulness—modeled after Penal Code section 7(1) and stating that a "willful" act or omission "'implies simply a purpose or willingness to commit the act, or to make the omission'"—was inadequate because it failed to distinguish between a dealer who believed in good faith that no refund or replacement was required under the Act, and one who had no such belief. (*Kwan, supra,* 23 Cal.App.4th at pp. 180-181.)

Although the *Kwan* court agreed with the dealer, it made clear its agreement was grounded in the specific facts of that case, rather than any blanket rejection of the definition of willfulness contained in Penal Code section 7(1): "MBNA was entitled to an instruction informing the jury its failure to refund or replace was not willful if it reasonably and in good faith believed the facts did not call for refund or replacement. Such an instruction would have given the jury legal guidance on the principal issue before it in determining whether a civil penalty could be awarded. The Penal Code definition of willful, by itself, gave inadequate guidance under the circumstances of this case." (*Kwan, supra,* 23 Cal.App.4th at pp. 186-187.)

But, as pertinent here, *Kwan* explains that the analysis of what constitutes willfulness in a particular case is a nuanced one, and "is not one easily captured in a single, uniformly applicable formula." (*Kwan, supra,* 23 Cal.App.4th at p. 182.) Instead, "[w]e should interpret willfulness in light of the particular statutory obligation allegedly violated and should eschew any interpretation that would render meaningless or inoperative the Act's distinction between willful and nonwillful violations." (*Kwan, supra,* 23 Cal.App.4th at p. 184.)

33

Thus, contrary to PacifiCare's assertion, *Kwan* does not require us to reject the language of Penal Code section 7(1)—and thus the language of Reg. 2695.2(y)—in any situation involving a two-tiered penalty provision. What it requires is that we evaluate the effect of that language in the context of the statute to which it applies, and determine whether it "render[s] meaningless or inoperative the [statute's] distinction between willful and nonwillful violations." (*Kwan, supra,* 23 Cal.App.4th at p. 184.) In this case, Reg. 2695.2(y) does not.

The acts and omissions prohibited by section 790.03(h) are each defined by reference to specific facts and relevant context demonstrating wrongfulness. For example, section 790.03(h)(1) describes the wrongful act of "[m]isrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue." That act can be committed inadvertently by one who misrepresents a fact he does not know to be incorrect. To willfully commit that act, one must have had a purpose or willingness to misrepresent the pertinent facts or provisions. The distinction between the inadvertent and willful violation is readily apparent. Likewise, section 790.03(h)(8) describes the wrongful act of "[a]ttempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured." Again, the act of settling a case based on a secretly altered application would be a violation of section 790.03(h) even if the settlement was accomplished inadvertently by a claims representative who was personally unaware of the alteration. To willfully commit that act, the insurer must have had a purpose or willingness to not only settle a claim, but to do so on the basis of a secretly altered application. Given the specific description of the prohibited act, the distinction between a person who commits the act inadvertently, and one who does so willfully is once again readily apparent.

The same is true of the other acts and omissions listed in section 790.03(h). Thus, as applied to section 790.03(h), the definition of "willful" or "willfully" set forth in Reg. 2695.2(y) does not blur the distinction between willful and nonwillful violations.

34

A parallel flaw exists in PacifiCare's assertion that Reg. 2695.2(y) is irreconcilably inconsistent with the statutory definitions of "willful" contained in the Insurance Code. When applied in context, those statutory definitions operate consistently with Reg. 2695.2(y).

PacifiCare points to section 11750.1, subdivision (d), which defines "'[w]illful' or 'willfully'" as referring to an act or omission committed "with actual knowledge or belief that such act or omission constitutes [a] violation and with specific intent to commit such violation." PacifiCare argues this language is inconsistent with the definition in Reg. 2695.2(y), which omits any requirement of an "intent to violate law."

But in contrast to Reg. 2695.2(y), the willfulness definition in section 11750.1 does not apply to any factually described act of wrongdoing. Instead, it applies to whatever act or omission "fails to comply with a final order of the commissioner." (§ 11756, subd. (a).) Thus, it is not the willful commission of the generic act or omission that is punishable under section 11750.1, but the intentional failure to comply with an "order of the commissioner." Thus, committing that wrong in a willful manner requires both knowledge that the specific conduct violated an order, and an intention to nonetheless engage in it.

If that same wrong were described in a manner consistent with the unfair practices described in section 790.03(h)—i.e., with the wrongfulness element included— the regulation might require that an insurer engage in conduct that fails to comply with the final order of the commissioner. Applying such a definition of willfulness in Reg. 2695.2(y) would make an act willful only if the actor had a "purpose or willingness to [fail to comply with the final order]."

Thus, when properly applied to the type of punishable conduct described in section 11756, the definition of willfulness in Reg. 2695.2(y) would *also* require a belief that some contemplated act or omission would violate a final order of the Commissioner, as well as an intent to engage in that violation. Consequently, Reg. 2695.2(y) actually

35

operates consistently with the definition of "willfully" contained in section 11750.1. (See *Kwan, supra,* 23 Cal.App.4th at p. 183 [commenting on the "slipperiness of the term 'willfulness'"].)

The two other Insurance Code statutes cited by PacifiCare operate in a similar manner, and thus do not alter our analysis.[17] We consequently reject PacifiCare's contention that the definition of "'[w]illful' or '[w]illfully'" in Reg. 2695.2(y) is inconsistent with the way in which those terms are defined in the Insurance Code.

PacifiCare's final challenge to Reg. 2695.2(y) is that it "fails to harmonize section 790.035 with section 790.03" because it so dilutes the meaning of a willful violation that it transforms the "enhanced" penalty under section 790.035 into the "customary" penalty. PacifiCare fails to cite any authority for the proposition that the definition of a willful violation must ensure that it be a relative rarity. We are aware of none and can fathom nothing in law or logic to support such a requirement.

Finding no merit in PacifiCare's contention that Reg. 2695.2(y) is invalid, we reverse the trial court's injunction prohibiting its enforcement.

---

[17] The definition of "'[w]illful'" in section 12340.9 is the same as in section 11750.1(d), and is likewise applicable to a person who "fails to comply with a final order of the commissioner under this chapter" (§ 12414.25, subd (a)), without describing any particular conduct. Thus the prohibited "act" is again the violation of the order—an act that could not be willfully committed under Reg. 2695.2 absent knowledge of the order and of conduct violating it. Hence, the effect of the regulation is consistent with the statutory definition of willfulness, which expressly requires those elements. And the definition of "'willful'" in section 1850.5 is applicable to a "person who uses any rate, rating plan, or rating system in violation of this chapter" (§ 1858.07), justifying the imposition of enhanced penalties in the case of a willful violation. There again, the prohibited act of using "any rate . . . in violation of this chapter" is not dependent on any particular conduct, but is strictly defined in terms of whether a statutory violation has occurred. Thus, that act could not have been committed willfully under the definition found in Reg. 2695.2(y) without establishing both knowledge of the chapter's requirements and an intent to violate one or more of them. Consequently, the regulation operates consistently with the statutory definition.

36

## DISPOSITION

The order imposing a preliminary injunction prohibiting enforcement of Regs. 2695.1(a), 2695.2(l), and 2695.2(y) is reversed. The case is remanded to the trial court with directions to also reverse its order granting the motion for judgment on the pleadings on the declaratory relief cause of action. The Commissioner is to recover his costs on appeal.

GOETHALS, J.

WE CONCUR:

FYBEL, ACTING P. J.

THOMPSON, J.